# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 19-1517V
Filed: October 14, 2026

| | | |
|---|---|---|
| ELIZABETH ALLEN-SCOTT, Parent and next friend of V.S., a minor, | * | |
| Petitioner, | * | |
| v. | * | Special Master Roth |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| Respondent. | * | |

*Richard Gage,* Richard Gage, P.C., Cheyenne, WY, for Petitioner.
*Sarah Black Rifkin,* U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION DENYING ENTITLEMENT[1]

On October 1, 2019, Mrs. Elizabeth Allen-Scott ("petitioner") filed a petition on behalf of her daughter, V.S., for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "Program"). Petition, ECF No. 1; 42 U.S.C. § 300aa-10, *et seq*.[2] The petition alleges that V.S. suffers from seizures and developmental delay, resulting from receipt of the diphtheria, tetanus, acellular-pertussis ("DTaP"), *Haemophilus influenzae* type b ("Hib"), pneumococcus ("Prevnar 13"), and rotavirus vaccines on October 3, 2016. Petition at 1-2.

An entitlement hearing was held on February 15, 2023, via videoconferencing before the then assigned special master. *See* Transcript ("Tr."), ECF No. 75. Following careful review and analysis of all evidence and testimony submitted in this case by both petitioner and respondent, and in accordance with the applicable legal standards, I find that petitioner has not provided

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), petitioners have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned finds that the identified material fits within this definition, such material will be redacted from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

preponderant evidence demonstrating that any of the subject vaccines caused-in-fact or otherwise contributed to V.S.'s seizure disorder or developmental delay. Accordingly, I find that petitioner is not entitled to compensation and that the petition must be dismissed.

## I. <u>Issues to Be Determined</u>

Petitioner alleges that the vaccinations V.S. received on October 3, 2016, caused her neurologic condition. Petition. Respondent disagrees and asserts that V.S.'s condition was attributable to her preexisting microcephaly and associated underlying brain abnormalities. Respondent's ("Resp.") Post-hearing ("Posth'g") Brief ("Br."), ECF No. 82. Thus, the parties dispute whether petitioner has established vaccine causation under *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005).

Also, at issue is whether the records support a significant aggravation of a pre-existing condition,[3] consistent with *Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135 (2009), and, if so, whether there is preponderant evidence to support that the vaccinations materially worsened V.S.'s condition beyond its expected natural progression.

## II. <u>Procedural History</u>

Petitioner filed her petition on October 1, 2019. Petition at 1-2. Multiple medical records were filed in support of the claim. Pet. Exs. 1-13, ECF Nos. 6, 9, 11, 12. The matter was assigned to former Special Master Gowen on January 6, 2020. Reassignment Order, ECF No. 14.

Respondent advised that he intended to defend the case. Status Report ("Status R."), ECF No. 21. Petitioner then filed an expert report authored by Marcel Kinsbourne, M.D.,[4] along with

---

[3] Petitioner's filings throughout the pendency of this case advanced a causation-in-fact theory—that the October 3, 2016 vaccinations more likely than not caused V.S.'s seizure disorder and developmental delay. However, petitioner's expert appeared to invoke a significant aggravation theory as well. *E.g.*, Pet. Ex. 15, ECF. No. 27, at 8; Tr. at 74. While petitioner's pre-hearing memorandum argued for entitlement under *Althen*, her subsequently filed statement of facts identified the *sole* disputed issue as whether "V.S.'s condition [was] significantly aggravated by the vaccinations she received on October 3, 2016". Petitioner's ("Pet.") Prehearing ("Preh'g") Br., ECF No. 62; Pet. Preh'g Statement of Facts, ECF No. 69. Petitioner did not meaningfully discuss significant aggravation under *Loving* until her reply to respondent's post-hearing brief (ECF No. 83)—after the close of expert testimony and following respondent's presentation of the case as litigated under a causation-in-fact framework. Neither petitioner's pre- and post-hearing briefs (ECF Nos. 62 & 77), nor respondent's pre- and post-hearing briefs (ECF No. 63 & 82) distinctly address a significant aggravation claim.

[4] Dr. Marcel Kinsbourne, who died in April 2024, was a pediatric neurologist and neuropsychologist long familiar to the Vaccine Program. He received his medical-degree equivalent from Oxford University, England, in 1955 and practiced in the United States beginning in 1967. Pet. Ex. 16 at 1. His career included academic appointments in pediatrics, neurology, and psychology, including many years at Duke University Medical Center, as well as clinical appointments as a senior staff physician in Ontario from 1974-1980 and a clinical associate in neurology at Massachusetts General Hospital from 1981-1991. *Id.* at 1-2; *see also*, *Fantini v. Sec'y of Health & Human Servs.*, No. 15-1332V, 2022 WL 1760730, at *5 (Fed. Cl. Spec. Mstr. May 2, 2022). He authored or coauthored more than 400 publications and served on several editorial boards. Pet. Ex. 16 at 5-32. Although highly experienced, Dr. Kinsbourne had not practiced hospital-based neurology since 1992. *Id.* at 2.

his curriculum vitae ("CV") and his referenced medical literature. Pet. Ex. 15, ECF No. 27; Pet. Ex. 16, ECF No. 28; Pet. Exs. 17-30, ECF No. 28.

In turn, respondent filed his Rule 4(c) report, an expert report authored by Shlomo Shinnar, M.D., Ph.D.,[5] Dr. Shinnar's CV, and his supporting medical literature. Resp. R., ECF No. 35; Resp. Ex. A, ECF No. 33; Resp. Ex. B, ECF No. 33; Resp. Ex. A, Tabs 1-6, ECF No. 33.

Following a status conference held on November 29, 2021, the Special Master framed the "main question at issue" to be whether "the seizures were strictly a function of microcephaly or whether the vaccines… acted as a trigger and caused the rapid onset of the seizures, that then contributed to the longer-term developmental delays." Rule 5 Order, ECF No. 39, at 4. Finding litigative risk on both sides, he encouraged the parties to consider settlement. *Id*. Respondent maintained his position to defend the matter. Status R., ECF No. 40.

Petitioner filed additional medical records. Pet. Exs. 31-3, ECF No. 44; Pet. Exs. 34-37, ECF No. 50; Pet. Ex. 38, Parts 1 & 2, ECF No. 55. Dr. Shinnar was replaced with another expert, Gregory Holmes, M.D.,[6] whose report and CV were filed on September 19, 2022. Status R., ECF No. 58; Resp. Exs. C & D, ECF No. 60. Associated medical literature was filed on January 31, 2023. Resp. Ex., Tabs 1-20, ECF No. 65. Petitioner filed additional items of medical literature (some of which were duplicative) but did not submit a supplemental expert report responding to either of respondent's expert reports. Pet. Exs. 39-43, ECF No. 64; Pet. Exs. 44-45, ECF No. 70.

Petitioner filed her pre-hearing memorandum on December 19, 2022 (ECF No. 62), in support of entitlement under an *Althen* framework. Approximately one month later, respondent filed his pre-hearing brief (ECF No. 63), requesting that the case be dismissed. On February 1, 2023, additional prehearing submissions were filed. Resp. Preh'g Statement of Facts, ECF No. 68; Pet. Preh'g Statement of Facts, ECF No. 69. Curiously, Petitioner's statement of facts

---

[5] Dr. Shlomo Shinnar is a pediatric neurologist, epileptologist, and neuroscientist with extensive clinical and research experience in childhood seizures. Resp. Ex. B. Dr. Shinnar holds both a Ph.D. in neuroscience and an M.D., and is board certified in neurophysiology, pediatrics, and neurology, with special competence in pediatric neurology. *Id*. at 2. He is an active clinician, professor, and researcher, and is currently serving as the Director of the Comprehensive Epilepsy Management Center at Montefiore Medical Center and the Albert Einstein College of Medicine in the Bronx, New York. Resp. Ex. A at 1. His clinical and research work has focused on childhood seizures and epilepsy, including an NIH-funded study of prolonged febrile seizures and a study of children whose first seizure occur in the absence of fever. *Id*. Dr. Shinnar has treated more than a thousand children with seizure disorders, supervised the care of several thousand more, and published extensively on seizure-related topics. *Id*.

[6] Dr. Gregory Holmes is a board-certified pediatric neurologist and clinical neurophysiologist with extensive clinical, academic, and research experience in pediatric epilepsy. Resp. Ex. D at 1-4. He received his M.D. from the University of Virginia School of Medicine in 1974, completed pediatrics training at Yale University School of Medicine in 1976 and pediatric neurology training at the University of Virginia in 1979, and has held faculty appointments at several major academic medical centers, including the University of Connecticut, Medical College of Georgia, Harvard Medical School, Dartmouth Medical School, and the University of Vermont. *Id*. at 1-2. He currently serves as Professor of Neurological Sciences and Pediatrics and as Chair of Neurological Sciences at the University of Vermont College of Medicine. *Id*. at 2. He remains an active clinician treating children with neurologic disorders in inpatient and outpatient settings and has published extensively in pediatric neurology, with an emphasis on pediatric epilepsy, particularly medically refractory epilepsy. Resp. Ex. C at 1; Tr. at 95. He treats approximately a thousand children with seizures or epilepsy a year. Tr. at 95-96.

identified the *sole* disputed issue as whether "V.S.'s condition [was] significantly aggravated by the vaccinations she received on October 3, 2016". Petitioner's ("Pet.") Prehearing ("Preh'g") Br., ECF No. 62; Pet. Preh'g Statement of Facts, ECF No. 69

An entitlement hearing was held before the Special Master on February 15, 2023; petitioner, Dr. Kinsbourne, and Dr. Holmes testified. *See generally*, Tr. On June 6, 2023, petitioner filed a post-hearing brief (ECF No. 77), and respondent responded on September 29, 2023 (ECF No. 82). Petitioner filed a reply (ECF No. 83) on October 12, 2023, including discussion of a significant aggravation under *Loving*.

On February 24, 2026, in anticipation of Special Master Gowen's retirement the following month, the matter was reassigned to me. Reassignment Order, ECF No. 89.

The matter is ripe for adjudication.

## III. <u>Relevant Terminology</u>

Several medical terms appear throughout the record and are defined here.

*Microcephaly* denotes abnormal smallness of the head and is often associated with intellectual or developmental impairment. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (33rd ed. 2020) [hereinafter "*Dorland's*"] at 1141. The occipitofrontal head circumference of a microcephalic infant is more than two standard deviations below the mean for age and sex, placing the infant in the 3rd percentile, meaning approximately 97 percent of all other infants in the given cohort have larger head sizes.[7] Resp. Ex. C at 6; *see also* Tr. at 21-22, 102; Cleveland Clinic, *Microcephaly* (Jan. 29, 2026), https://my.clevelandclinic.org/health/diseases/9843-microcephaly (last visited Oct. 14, 2026).

The *corpus callosum* is a band of white-matter fibers connecting the cerebral hemispheres. *Dorland's* at 412. The *basal ganglia* are interconnected structures involved principally in regulating motor activity. *Id*. at 750. The *thalamus* is a diencephalon structure that relays sensory and motor information to the cerebral cortex and contributes to sleep, wakefulness, learning, and memory. *Id*. at 1877; *see also*, Cleveland Clinic, *Thalamus* (Feb. 5, 2026), https://my.clevelandclinic.org/health/body/22652-thalamus (last visited Oct. 14, 2026).

A *seizure* is a sudden episode of abnormal involuntary neurologic activity and may constitute a single episode of epilepsy. *Dorland's* at 1600. A *convulsion* is a violent, involuntary contraction, or series of contractions, of the voluntary muscles. *Id*. at 406. A *febrile seizure* is a convulsion associated with high fever, usually affecting infants and children. *Id*.

A *focal seizure*, also known as a *partial seizure*, originates in a localized area of the cerebral cortex. *Id*. at 1660. A *simple partial seizure* may involve autonomic, psychological, or sensory symptoms without loss of consciousness. *Id*. at 1661. A *complex partial seizure* involves

[7] V.S.'s head circumference was in the 1st percentile at the time of the subject vaccinations. Pet. Ex. 12 at 16.

some impairment of consciousness and may include repetitive, non-purposeful movements followed by confusion or amnesia. *Id*. at 1660.

*Epilepsy* is an enduring neurologic disorder characterized by episodic disturbances of brain function, which may manifest as impaired consciousness, abnormal movements, sensory symptoms, or autonomic changes. *Id*. at 626. Epilepsy may be classified according to its etiology and whether the seizures began in a localized area or involved widespread brain dysfunction. *Id*. Thus, a seizure is an individual clinical event, while epilepsy may be the underlying condition that predisposes a person to recurrent seizures.

*Myoclonus* is the term for brief, shock-like contractions, or "jerks," of a muscle that may appear synchronously in a group of muscles. *Id*. at 1205; Tr. at 113. Myoclonus may be physiologic or may occur as part of a disease process. *Dorland's* at 1205. A *myoclonic seizure* is a type of myoclonus that occurs due to an underlying epileptic condition; myoclonic seizures are typically minor, brief, and do not give rise to loss of consciousness or brain damage. Cleveland Clinic, *Myoclonic Seizure* (June 3, 2022), https://my.clevelandclinic.org/health/diseases/23172-myoclonic-seizure (last visited Oct. 14, 2026); *see also* Tr. at 113. *Myoclonic epilepsy* refers to a group of disorders in which epileptic seizures are accompanied by myoclonic muscle contractions. *Dorland's* at 626, 1205.

*Dravet syndrome* is a genetically based epileptic disorder generally associated with a pathogenic variant of the SCN1A gene, which encodes sodium channels involved in transmitting electrical signals between brain cells.[8] Resp. Ex. C at 8; *see also* Cleveland Clinic, *Dravet Syndrome* (July 2, 2025), https://my.clevelandclinic.org/health/diseases/22517-dravet-syndrome (last visited Oct. 14, 2026). Dysfunction of these channels may lead to afebrile seizures precipitated by external stressors, such as by vaccination.[9]

## IV. <u>Factual Record</u>

### A. Prenatal and Perinatal Care

The prenatal records filed in this case are limited but reflect routine prenatal care without significant complications. Pet. Ex. 7 at 51-3. However, neuroimaging performed on V.S. after the subject vaccinations revealed structural abnormalities of the brain interpreted by both treating physicians and the experts in this case as suggestive of a prenatal hypoxic/ischemic encephalopathic event. *E.g.*, Pet. Ex. 2 at 203-04 (a treating physician, Marissa Meredith Vawter-Lee, M.D., opining that even without contemporaneous documentation of a prenatal or

---

[8] V.S. was not diagnosed with Dravet syndrome.

[9] Fernando Cendes & Raman Sankar, *Vaccinations and Febrile Seizures*, 52 Epilepsia 23 at 2 (2011), filed as "Pet. Ex. 20" and as "Resp. Ex. E, Tab 10" ("Thus vaccination does trigger the onset of seizures in one third of patients with Dravet syndrome."); Nienke Verbeek et al., *Vaccination Triggers, Rather Than Causes, Seizures*, 134 Pediatrics 658 at 2 (2014), filed as "Pet. Ex. 25" ("these findings suggest that the immune response activated by vaccination triggered a seizure without necessarily producing a high fever or even a fever at all.").

intrapartum ischemic insult, that type of insult "most likely" accounts for V.S.'s abnormal brain imaging); Tr. at 29, 84 (Dr. Kinsbourne stated that "[i]t's perfectly clear" that V.S.'s case was "caused by a prenatal structural mishap" and that "some event during the pregnancy… destroyed some aspect of [V.S.'s] brain").

1. Birth

V.S. was born at 39 weeks' gestation by spontaneous vaginal delivery on May 19, 2016. Pet. Ex. 1 at 8, 81. She weighed 6 pounds, 3 ounces with a head circumference of 12.99 inches. *Id*. at 8. Apgar scores were normal at one and five minutes, and she was assessed as a healthy newborn. *Id*. All state-mandated tests that screen infants for amino acid disorders, biotinidase deficiency, endocrine disorders, fatty acid disorders, galactosemia, hemoglobinopathy, organic acid disorders, and cystic fibrosis were normal. *Id*. at 31-32. At discharge, V.S. weighed 5 pounds, 14 ounces. *Id*. at 67.

2. Early Well-Child Visits

V.S. was presented to the pediatrician on May 25, 2016, at six days old. The record included that the mother and grandmother wanted to "discuss feeding issues[,] sleeping schedule" and growth and development.[10] Pet. Ex. 12 at 1-4. V.S. was noted to be full term, on breast milk, doing well, with jaundice and a "bump on back of the head." *Id*. at 1. The record also included that the "occiput is very prominent and overlapped."[11] *Id*. at 3. Head circumference measured 12.84 inches, placing V.S. in the 4th percentile; she was 6 pounds, 13 ounces, or in the 7th percentile; and her height was 19.5 inches, or in the 39th percentile. *Id*.

On June 20, 2016, V.S. was presented as a "sick child." *Id*. at 5-9. She was four weeks old, 20.12 inches long, 7 pounds, 14 ounces with a head circumference of 13 inches. *Id*. at 5. The corresponding percentiles were not noted but V.S.'s head circumference was below the first percentile or severely microcephalic.[12] V.S. was diagnosed with oral moniliasis, or thrush, which was considered mild. Treatment was deferred unless it worsened. *Id*. at 8. The assessment section

[10] The pediatric records appear to contain substantial computer-generated or templated material that is repeated across visits and does not necessarily reflect findings specific to V.S. on the date of service. For example, multiple entries include the same "Context" language: "…discuss feeding issues and sleeping schedule…growth and development." Pet. Ex. 12 at 1, 5, & 10. Identical statements under the heading "General" indicate that the patient "[d]enies fever, chills, sweats, anorexia, fatigue/weakness, malaise, weight loss and sleep disorder," and under the heading "Medications" that medications were reviewed with the patient. *Id*. at 1, 2, 5, 6, 10, & 11. Likewise, several assessments state that V.S. was "[d]oing well with normal growth and development" which cannot be reconciled with abnormal findings in the record. *Id*. at 3, 8, & 12. I therefore do not treat these repeated, apparently templated entries as necessarily reflecting an individualized clinical assessment of V.S. at each visit.

[11] *Occiput*, is the posterior part of the head. *Dorland's* at 1292.

[12] This head circumference measurement would place V.S. below the 1st percentile. National Center for Health Statistics & National Center for Chronic Disease Prevention and Health Promotion, *Birth to 36 Months: Girls Head Circumference-for-Age and Weight-for-Length Percentiles*, the "CDC growth chart", CDC, tbl. 1 (Oct. 16, 2000), https://www.cdc.gov/growthcharts/data/set1clinical/cj41c020.pdf (last visited Oct. 14, 2026).

of the provider's notes again repeated that V.S. was "[d]oing well with normal growth and development." *Id*.

On July 22, 2016, V.S. was presented at two months of age. She weighed 9 pounds, 10 ounces, placing her in the 18th percentile; her height was 22.6 inches, or in the 57th percentile; and her head circumference was 14 inches, noted as "0%".[13] *Id*. at 10, 12. The assessment section again included that V.S. was "[d]oing well with normal growth and development." *Id*. at 12. She was administered the DTaP, Hib, poliovirus ("IPV"), Prevnar 13, and rotavirus vaccines without report of any adverse reaction following vaccination. *Id*. at 12-14.

On October 3, 2016, V.S. was presented for a four-month well-child visit. Pet. Ex. 12 at 16. In the week leading up to this appointment, V.S. reportedly had a "cold" or upper respiratory infection ("URI") with mild rhinorrhea. Pet. Ex. 8 at 7-8, 10, 15. At the time of the October 3, 2016 appointment, the URI had reportedly resolved, and no fever was reported. Tr. at 30; Pet. Posth'g Br. at 3. V.S. weighed 11 pounds, 13 ounces, placing her in the 8th percentile; she was 24.25 inches long, or in the 36th percentile; and, her head circumference was 15.12 inches, or in the 1st percentile.[14] Pet. Ex. 12 at 16.

At this appointment, V.S. was examined by Pediatric Nurse Practitioner Teresa Renfrow, ARNP.[15] Pet. Ex. 12 at 16. The record included that V.S. was "[n]ormocephalic" with atopic dermatitis and left esotropia.[16] *Id*. at 18-19. An ophthalmology consultation was ordered and skin care advice provided. *Id*. NP Renfrow listed a number of "[m]inimal" and "[e]merging" developmental skills under two categories: "Personal-Social and Language" and "Fine/Gross Motor". *Id*. at 17-18. The record does not, however, indicate whether the listed skills were observed by the provider, reported by the family, or included automatically as part of a developmental screening template. Most of the listed skills contain no accompanying notation or comment. Only four items—"[s]pontaneous smile…, [v]ocalizes…, [l]aughs/[s]queals…, 'OOO/AAH'"—were marked with an "R," the significance of which is not explained in the

---

[13] *Microcephaly* is commonly defined as a head circumference more than 2 standard deviations below the mean for age and sex, corresponding approximately to the 3rd percentile. Stephen Ashwal et al., *Practice Parameter: Evaluation of the Child with Microcephaly (an Evidence-Based Review): Report of the Quality Standards Subcommittee of the American Academy of Neurology and the Practice Committee of the Child Neurology Society*, 73 Neurology 887 at 1 (2009), filed as "Pet. Ex. 18". Some authorities define *severe microcephaly* as a head circumference more than 3 standard deviations below the mean, a measurement which ranks *below* the 1st percentile. *Id*. The American Academy of Pediatrics recommends using the 2.3rd percentile of the World Health Organization growth curves (labeled as "2nd" on the curve) to identify children with potentially suboptimal growth in the first 24 months after birth. American Academy of Pediatrics, *Term Infant Growth Tools*, APA (Feb. 13, 2026), https://www.aap.org/en/patient-care/newborn-infant-and-early-childhood-nutrition/newborn-and-infant-nutrition-assessment-tools/term-infant-growth-tools/ (last visited Oct. 14, 2026).

[14] V.S. was four months *and two weeks* old at the time of this visit. Pet. Ex. 12 at 16. The CDC growth chart, *supra* note 12, indicates that a female infant of that age with that head circumference would be placed *below* the 1st percentile.

[15] Prior visits were conducted by Pediatrician Bahram Sepehri, M.D. *E.g.* Pet. Ex. 12 at 1.

[16] *Esotropia*, a form of strabismus, is an eye condition in which the visual axis of an eye deviates toward that of the other eye, resulting in diplopia. *Dorland's* at 641, 1748.

medical record.[17] *Id*. at 17. The "Assessment" section noted "Comment Only" without further explanation. *Id*. at 18. *Id*.

V.S. received her four-month-old vaccinations, including DTaP, Hib, IPV, Prevnar 13, and rotavirus vaccinations, on October 3, 2016. *Id*. at 19-20.

### B. First Post-Vaccination Medical Encounter

#### 1. October 7-8, 2016

Four days later, in the afternoon of October 7, 2016,[18] V.S. was presented as a "[w]alk-in" to the emergency department ("ED") of Norton Children's Hospital ("Norton") with a report of "tremors".[19] Pet. Ex. 8 at 2. That day, Admitting Physician Karen L. Skjei, M.D., assessed V.S. and discussed the history of present illness with her parents. *Id*. at 10. Per parental report, V.S. was exhibiting movements (involving all four extremities either singly or together) that were first noticed after V.S. awoke from a nap following her October 3, 2016 vaccinations that continued thereafter at frequent intervals (occurring approximately every five to fifteen minutes) while V.S. was awake.[20] *Id*. at 10; *see also* Pet. Ex. 13 at 1-2. The records include that V.S. did not appear distressed by the episodes and there was no postictal state. *E.g.*, Pet. Ex. 8 at 14.

Dr. Skjei wrote that V.S. had movements of her arms and legs, but not her eyes, reportedly "after [V.S.] received her 4 month vaccinations." She had a mild "lazy eye" that was "'run[ning] in the family'". *Id*. at 10. V.S.'s father was concerned that V.S. was having "a reaction from the Tdap vaccine," which he reported has a "risk [of] 4 in 100,000." *Id*. Petitioner reported that V.S. had a "cold… with mild runny nose" the previous week that resolved. Dr.

---

[17] The "R" appears consistent with conventional notation identifying items that may be assessed by *report* of the patient or of a caregiver. I do not interpret the notation, standing alone, as establishing that the skill was actually reported or demonstrated at the visit.

[18] Although there appears to be some discrepancy in the records regarding the precise date of the communication, the record reflects that petitioner contacted the pediatrician concerning V.S.'s jerking movements—either on October 7 or 11, 2026—and that she was advised to take V.S. to the emergency department for evaluation. *Compare* Pet. Ex. 8 at 6 (Dr. Sepehri listed as the referring provider in the October 7 ED intake documentation), *with* Pet. Ex. 12 at 26 (NP Renfrow recalling that petitioner called on October 11). Either way, it appears that the first medical encounter post-vaccination (whether remotely with the pediatrician's office or in person for an emergency medical evaluation) occurred on October 7, 2026.

[19] In an affidavit filed approximately three years later, petitioner stated that V.S. exhibited "odd jerking" of the extremities, without apparent distress, that continued for several days before she was taken to the ED on October 7, 2016. Petitioner was informed that the movements were myoclonic seizures. Pet. Ex. 13 at 1-2. There is no record of any communication (regarding tremors, abnormal movements, or any other concern) between petitioner or V.S.'s father and a medical provider during the four-day period following the October 3, 2016 visit.

[20] Dr. Kinsbourne interpreted this report as the onset of V.S.'s myoclonic epilepsy, characterizing the movements as unusually severe due to their beginning within hours of vaccination and their persistence over the ensuing days. Tr. at 28, 30, 80.

Skjei included a history of "[m]ono and colds at home". *Id*. Petitioner further reported that V.S.'s "head circumference was previously below 5th percentile until most recent visit."[21] *Id*.

V.S. was admitted to the neurology service by Dr. Skjei, who observed "seizure like episodes," reportedly beginning "hours after [V.S.'s] 4 month vaccines" with episodes occurring approximately every five minutes without postictal state; Dr. Skjei also noted that the child seemed unbothered by the episodes. *Id*. at 14. Continuous video electroencephalogram ("EEG") monitoring was ordered. Seizure precautions were initiated. *Id*. The differential diagnosis included myoclonus, infantile spasms, and febrile seizure. *Id*.

*Neurology Examination*

Dr. Skjei discussed V.S.'s history with the neurology team and also conducted examinations. Pet. Ex. 8 at 44-46. V.S. was noted as an alert, awake, playful, and consolable infant, who tracked and displayed full range of motion of extraocular muscles with noted left eye esotropia, slight dysmorphism[22] of the face, and prominent medical epicanthal folds.[23] *Id*. at 44. Cranial nerve testing was generally normal. *Id*. She had normal strength in all extremities with symmetric movement bilaterally but had mild generalized hypotonia. *Id*. at 45. Deep tendon reflexes were symmetric and normal throughout, and neonatal reflexes, including Moro, plantar grasp, palmar grasp, rooting, and sucking reflexes, were intact. *Id*. Sensation to light touch was intact in the dermatomes that were tested. *Id*.

The neurology team documented that V.S. was microcephalic at birth with a current head circumference of approximately 14.96 inches or "around 6-7th percentile."[24] *Id*. Her weight was "low" and "concerning" at approximately the 2.6th percentile. *Id*. Concern for developmental delay was noted. She did not exhibit a smile during any interactions with the team, had mild hypotonia, and by parental report had only rolled from prone to supine position once. *E.g.*, *id*.

The team noted that V.S. was presented to the ED for abnormal jerking that reportedly began upon waking from a nap following her four-month vaccinations with movements every 10 to 15 minutes, without change in intensity, and only when V.S. was awake. *Id*. At the time of the examination, she was afebrile and well-appearing. *Id*. A broad differential diagnosis included

---

[21] The pediatric record does not reflect discussions with the parents about V.S.'s head circumference and includes only measurements and, at times, the corresponding percentile. *E.g.*, Pet. Ex. 12 at 10. At V.S.'s October 3, 2016 visit, her head circumference was 15.12 inches, placing her in the 1st percentile. *Id*. at 16.

[22] *Dysmorphism* is an abnormality in form or structure, such as a malformation. *Dorland's* at 572, 1164.

[23] A *medical epicanthal fold* is a vertical fold of skin of the upper eyelid that covers the inner corner of the eye and presents as a congenital anomaly. *Dorland's* at 277, 623. An *epicanthal fold* is commonly seen as a normal characteristic among certain ethnic groups. *Id*. at 623.

[24] Of note, V.S. was older than four months at the time of this examination, and the CDC growth chart, *supra* note 12, indicates that a four-month-old girl's head circumference of 15 inches ranks below the 1st percentile. Dr. Kinsbourne explained that V.S. would no longer be considered to be microcephalic if placed in the 6th or 7th percentile, however, as "the measurements seem[ed] to fluctuate somewhat," he opined that V.S. was "either microcephalic or nearly so" at this time in her course. Tr. at 30.

metabolic, mitochondrial, genetic,[25] and structural brain abnormalities as potential etiologies for V.S.'s seizure-like activity. *Id.* V.S. was maintained on seizure precautions and started on levetiracetam and pyridoxine. *Id.* at 46.

*First EEG Study*

Thirteen hours of video EEG monitoring captured V.S.'s "[m]arkedly abnormal" movements due to "extremely frequent myoclonic seizures" associated with multifocal spike-wave discharges. Pet. Ex. 8 at 22-23, 45. The discharges originated from the mid-central region and spread variably to the left or right, correlating clinically with jerking movements of the contralateral extremity. *Id.* at 23. The findings were interpreted as consistent with focal or multifocal and concerning for infantile myoclonic epilepsy. *Id.* at 23, 45.

*First MRI Examination*

A multiple magnetic resonance imaging ("MRI") studies of the brain, including spectroscopy testing, were done and interpreted as normal. Pet. Ex. 8 at 48-55.[26]

2. <u>October 9-12, 2016</u>

V.S.'s neurologic examinations remained stable with intact cranial nerves and reflexes, normal sensation and normal strength in all extremities, but with persistent hypotonia. *E.g.*, Pet. Ex. 8 at 32. Pediatric Neurologist Arpita Lakhotia, M.D., characterized V.S. as a four-month-old with new-onset myoclonic seizures in the context of developmental delay, microcephaly, and failure to thrive. *Id.* at 35.[27] Despite escalation of antiepileptic treatment, V.S. continued to experience frequent myoclonic jerks while awake, with episodes observed during rounds and reported by her parents throughout the hospitalization. *Id.* at 24, 26, 27, and 31.

V.S.'s parents reported concern that her seizures were the result of aluminum toxicity from her recent vaccinations and per their request, aluminum testing was added to the diagnostic workup. *E.g.*, *id.* at 26. Other consultations were obtained during the admission, including

---

[25] Specimens obtained during the admission allowed for an epileptic encephalopathy panel to be conducted and to screen specifically for Dravet syndrome. The laboratory identified only one heterozygous variant to the CLN6 gene. Its significance was classified as "[u]nknown." Pet. Ex. 8 at 56-57. Biallelic CLN6 mutations have been associated with neuronal ceroid lipofuscinosis and progressive myoclonic epilepsy and neurological decline. *Id.* at 56, 276.

[26] Later records indicate that the initial MRI results were not normal. As discussed *infra* Section IV.D.2, a radiologist from an outside hospital compared the October 8, 2016 MRI to a subsequent MRI dated September 8, 2017, and found that the "white matter signal abnormality [was] *more* evident" on the September 2017 exam. Pet. Ex. 2 at 91-96 (emphasis added). The radiologist added that "[s]imilar to the prior study," thinning of the posterior corpus callosum and decreased volume in the basal ganglia and thalami were observed and that the lateral and third ventricles and the extraaxial spaces were noted to be slightly more prominent than on the earlier exam. *Id.*

[27] Dr. Lakhotia noted the temporal relationship of V.S.'s vaccinations and seizure onset but also included a "febrile sz," or *febrile seizure*, despite the absence of any documented or reported fever in the contemporaneous medical records. Pet. Ex. 8 at 35.

ophthalmology and nutrition services, the latter due to V.S.'s low weight-for-length percentile and concerns of failure to thrive. *Id*. at 15-19, 21. She was discharged on October 12, 2016 with continued antiepileptic management [28] and scheduled appointments for outpatient follow-up care. *Id*. at 26. V.S. was not presented for any of the follow-up appointments scheduled.[29]

## C. Outpatient Care and Subsequent Hospitalizations

### 1. Pediatric Appointments

Three months later, on January 4, 2017, V.S. was presented to NP Renfrow for a "sick-child visit". Pet. Ex. 12 at 22-25. Her father reported that V.S. was "[s]pitting up" and had "shaking episodes with crying," that he attributed to a gastrointestinal ("GI") issue. He reported that she had been diagnosed with "reflux" and prescribed ranitidine.[30] Pet. Ex. 12 at 22-25. He further reported that "[t]hey [had] stopped formula" and started V.S. on a ketogenic diet supplemented with coconut oil and juices. *Id*. at 22. On that day, V.S. weighed 13 pounds, 0.5 ounces, or in the 1st percentile; she was 25.75 inches tall or in the 19th percentile. She was noted to be in the 1st weight-for-length percentile. *Id*. Her head circumference was not documented. NP Renfrow wrote "[f]eeding difficulties and mismanagement" on the "problem list". *Id.* at 35. She advised V.S.'s parents that the ketogenic diet and ranitidine should be stopped and only hypoallergenic formula should be given. She cautioned them that "the things they are feeding the baby" can cause "harm."[31] Id. at 25.

V.S. was presented again on January 18, 2017, for a sick-child visit. *Id*. at 26-29. NP Renfrow wrote:

> This child is 7 months old and 8 days after her 4 month well check developed some jerking movements, mom called on Oct. 11th, which was 8 days after these vaccines and we recommended she go to [the ED]… where

[28] Discharge medications included clobazam and levetiracetam, antiepileptic medications, together with coenzyme Q10, levocarnitine, pyridoxine, riboflavin, and thiamine; several of the latter had been initiated empirically while evaluation for possible mitochondrial dysfunction was pending. Ex. 8, p. 8.

[29] Discharge instructions required a primary care appointment within two to three days of discharge and a follow-up appointment with Dr. Skeji in one month. Pet. Ex. 8 at 9. No records were filed that show these appointments were kept. On January 30, 2017, Dr. Lakhotia reportedly discussed V.S.'s case with her primary care provider who reported only seeing V.S. twice since her October 2016 hospitalization—on January 4 and January 18, 2017. *Id*. at 277; *see also* Pet. Ex. 12 at 22-29. A January 29, 2017 consultation with Social Services was ordered due to concerns of "non-complian[ce] with seizure medications prescribed 4-5 months prior, [with] no neurology follow up despite continued seizure activity." Pet. Ex. 8 at 329.

[30] No medical records were filed memorializing a diagnosis of "reflux," who made the diagnosis, or prescribed ranitidine. A January 29, 2017 consult summary listed ranitidine as a medication initiated by "Provider, Historical" on December 19, 2016. Pet. Ex. 2 at 686.

[31] The record indicates that "[m]edications were reviewed with the patient during this visit"; there was no mention of antiepileptic medications being administered. Pet. Ex. 12 at 22.

> they determined child to have myoclonic jerking and put child on 2 seizure medications.

*Id*. at 26.[32] Between V.S.'s October 2016 hospitalization and her January 4, 2017 sick-child visit, V.S.'s parents began feeding her a ketogenic diet including coconut oil. NP Renfrow noted that at her last pediatric visit, V.S.'s parents were advised to feed her only a hypoallergenic formula. *Id*. Petitioner reported that "the change in formula helped at first a great deal but [has since] gotten a little worse," noting that V.S. was having at least "3 jerking episodes a day but that these do subside at times with pressure placed on abdomen." *Id*. Despite NP Renfrow advising the parents to stop giving her ranitidine,[33] petitioner reported that V.S. was still taking it daily schedule and requested a pediatric gastroenterology referral. *Id*. V.S. had not been given the prescribed antiseizure medication for over three months.

V.S. weighed 13 pounds, 4 ounces, placing her below the 1st percentile; her height was 26 inches, or in the 19th percentile; and she was placed in the 1st weight-for-length percentile. *Id*. Head circumference was not measured.

NP Renfrow wrote, that V.S.'s "feeding problems" and "jerking episodes" were discussed with V.S.'s parents:

> Mom states that the child had been on two different seizure medications and was making the jerking episodes get worse and more frequent. They proceeded to wean her off her seizure medications… without consult to Neurology. Parents stated that during the hospital admission they felt like there was a lack of communication with the physicians at the hospital and didn't feel the child was having seizures. Mom states that the episodes have improved but not gone away totally.

*Id*. V.S. was noted to be well-appearing, appropriate for her age, and smiling. *Id*. at 27. No acute distress or episodes of jerking occurring during the visit were documented.

"Feeding difficulties and management" and "[m]yoclonic jerk" were included on the visit summary's problem list. *Id*. at 28. The importance of neurological consultation was reinforced, and NP Renfrow offered to refer V.S.'s parents to a different hospital. *Id*. Upon viewing a cellphone video of V.S. offered by her parents, NP Renfro advised that, in her professional opinion, "[V.S.] appeared to be having seizure like activity." *Id.* at 28. V.S.'s parents refused a neurology referral again. *Id*. at 28-29. NP Renfrow encouraged scheduling a well-child appointment since the six-month well-child visit had been missed. *Id*.

2. <u>Second Hospitalization (January 28, 2017-February 3, 2017)</u>

---

[32] This account is clearly inaccurate; V.S. was presented to the ED on October 7, 2016. Pet. Ex. 8 at 2.

[33] Ranitidine was the only medication listed as active in the visit summary. Pet. Ex. 12 at 26.

Ten days later, on January 28, 2017, V.S. was presented to the Norton ED for seizures. Pet. Ex. 8 at 191-98. She was noted to be an 8-month-old with a history of status epilepticus, developmental delay, and other issues.[34] *Id*. at 194, 222. Recent EEG was suggestive of myoclonic jerks. An October 8, 2016 MRI was normal.[35] *Id*. at 194. It was noted that V.S. had been prescribed "Keppra and Onfi,"[36] which her parents stopped giving her; they reported that "these medications" had caused V.S.'s seizures "[to increase] in frequency to multiple seizures every hour" and "[to] become more violent." *Id*. at 194. They voiced their disagreement with the medical management of the neurology service at "U of L."[37] There had been no neurologic evaluation since her discharge. *Id*. She had not received any vaccinations since receipt of her four-month vaccinations because her parents reported that V.S. "began to have seizures shortly after [their administration]". *Id*. at 195.

Her parents further reported that V.S. was "started on a '[k]etogenic diet'" that "seem[ed] to be helping with the frequency of [V.S.'s] seizures." *Id*. at 194. During the assessment, V.S.'s parents were observed to be feeding her from a can labeled "Elecare".[38] *Id*. The parents reported that V.S. was having four to twelve seizures per day with jerking of all extremities, typically lasting for less than one minute, during which she cried with her eyes fixed "straight ahead," followed by bilateral stiffening of the lower extremities and "mild hand jerking lasting 30 seconds." She would immediately return to baseline without a postictal state. *Id*. at 194, 214.

The ED provider wrote that V.S. had been taken to "the ED" on January 25, 2017, "for fever and was diagnosed with a UTI that was treated with Omnicef."[39] *Id*. V.S.'s parents reported

---

[34] Medical providers considered notifying Child Protective Services ("CPS") "given medication noncompliance, inability to follow through with appointments and taking a child with seizures off [antiepileptic medications]." Pet. Ex. 8 at 277, 516.

[35] *But see*, *supra* note 24 (indicating that the October 8, 2016 MRI results were not normal).

[36] "Keppra," or *levetiracetam*, is an antiepileptic medication administered in the treatment of partial and myoclonic seizures and idiopathic generalized epilepsy. *Dorland's* at 1018. "Onfi," or *clobazam* is a benzodiazepine with antiepileptic actions and is used as an adjunctive treatment for epilepsy. *Dorland's* at 367; *see also*, *supra* note 28.

[37] The record does not contain contemporaneous medical records from "U of L," presumably UofL Health, a regional academic health system with multiple hospitals. UofL Health, *About UofL Health* (2026), https://uoflhealth.org/about/ (last visited Oct. 14, 2026). V.S.'s parents may have been referring to the October 7, 2016 admission, during which V.S. was followed by the neurology service at Norton; affiliation between Norton Healthcare, UofL Physicians (Pediatrics), and the University of Louisville School of Medicine would be formally finalized on March 1, 2020. Kate Eller, Norton Healthcare, *University of Louisville Finalize Pediatric Integration* (Mar. 2, 2020), https://nortonchildrens.com/news/norton-healthcare-university-of-louisville-finalize-pediatric-integration/ (last visited Oct. 14, 2026).

[38] A treating provider noted that "Elecare [is] hypoallergenic and not a straightforward ketogenic formula." Pet. Ex. 8 at 219. *EleCare* is a formula for "infants with food allergies or GI conditions." Abbott, *EleCare* (2026), https://www.elecare.com/product-information/elecare (last visited Oct. 14, 2026).

[39] A treating provider noted that V.S. "was recently diagnosed with a UTI at NWCH and is on cefdinir for E. Coli UTI." Pet. Ex. 8 at 214. A *UTI* is a urinary tract infection. *Dorland's* at 1983. "Omnicef," or *cefdinir*, is a broad-spectrum antibiotic, especially effective against gram-negative organisms, such as *Escherichia coli*. *Dorland's* at 306, 326; *see also* Pet. Ex. 8 at 218. *NWCH* may refer to Norton Women's and Children Hospital. Norton

that V.S. had been afebrile for the last 48 hours, with no cough, congestion, vomiting, diarrhea, or known sick contacts. *Id*. at 194-95, 214. They reported that, over the last 24 hours, V.S. had experienced approximately eight seizures, including three episodes lasting more than five minutes, prompting presentation first to an outside hospital before presenting to Norton for further evaluation.[40] *Id*. Her father reported that V.S. had seizures "over five minutes each" with fever during the course of her UTI. *Id*. at 221.

V.S.'s parents voiced concerns about the use of "anti-seizure medication" because "'[t]hey just threw all these medications at her without knowing the cause of the seizures.'" Her father stated, "'I don't see how they could even read her brain MRI because I couldn't even see anything in many of the slices. I couldn't even see the hippocampus.'"[41] *Id*. at 195, 219. When asked if he had spoken with the pediatric neurology team about the medications and his concerns of their safety and efficacy, her father advised that he had called but then stated "'[he] [did not] care'" what the neurologists advised because he was a "'grown… man'" and would make "whatever decisions" that he wanted for his family without "'any doctor's approval'". *Id*. at 214. He was noted in the record to be "demanding, argumentative, [and] resistant to recommendations and conventional therapy" for V.S. *Id*. at 226. He expressed a belief that "milk proteins had worsened [V.S.]'s seizures and that they were greatly reduced by change in formula." *Id*.

On examination, V.S. was interactive and in no acute distress; however, she had diffuse hypotonia, head lag, and inability to sit unsupported. *Id*. at 196. Head circumference was 15.75 inches, placing her below the 1st percentile.[42] *Id*. Her height was 25.59 inches, and her weight was 14 pounds, 8.8 ounces. Pet. Ex. 8 at 196. Her parents stated she had "always been long but underweight with a small head." *Id*. at 219.

While in the ED, V.S. experienced multiple seizures lasting less than two minutes, which consisted of generalized tonic-clonic activity, vocalization, and oxygen desaturation into the 60s, and, on one occasion, required assisted ventilation with bag-mask support due to concerns for hypoxia. *Id*. at 196-97. Treatment with levetiracetam was advised, but V.S.'s parents expressed significant hesitation and declined its administration. *Id*. The seizures continued; nursing staff documented "full body shaking" with "[a]rms straight and stiff [and] eyes twitching" as well as "[o]ral cyanosis"; the "safety of [V.S] was discussed… as [she] became hypoxic with each episode"; "[V.S.'s] father responded, "'…that's normal for a seizure.'"; ultimately, the parents consented to administration of fosphenytoin.[43] *Id*. at 196. Although V.S. initially improved after receiving fosphenytoin, she had another seizure, but her parents refused administration of

Healthcare (2026), https://nortonhealthcare.com/location/loc0000192204/ (last visited Oct. 14, 2026). There were no records from the January 25, 2017 emergency evaluation filed.

[40] Records from this presentation to an outside hospital were not filed.

[41] Petitioner's father was noted to be "pursuing an MBA" and was "'former military'". Pet. Ex. at 221.

[42] *See also* CDC growth chart, *supra* note 12.

[43] *Fosphenytoin* is an antiepileptic medication, used in the treatment of epilepsy. *Dorland's* at 728.

lorazepam[44] against medical advice. *Id*. at 196, 198. V.S. was admitted to the pediatric intensive care unit ("PICU"). *Id*. at 197.

*In-patient Management*

While in the PICU, V.S. was treated with antiepileptic medications, including levetiracetam and fosphenytoin. On day three after admission and after she was stabilized, V.S. was transferred to a general pediatric unit on maintenance levetiracetam. Pet. Ex. 8 at 211. A concern for Batten syndrome[45] was noted due to signs of developmental delay and a CLN6 gene variant seen on an early-onset epilepsy panel; subsequent confirmatory testing, however, was negative. *Id*. at 211, 253, 269, & 505. A February 21, 2017 skin biopsy did not identify ceroid lipofuscinosis indicative of the syndrome. *Id*. at 297, 302.

V.S. was diagnosed with mild gastroesophageal reflux following a comprehensive GI workup. *Id*. at 292-94. At the request of the parents, V.S. was transitioned to omeprazole.[46] She was placed on a modified ketogenic diet with specialized formula supplementation. *Id*. at 211.

*Second EEG*

V.S. underwent video EEG monitoring from January 29 to 30, 2017. Pet. Ex. 8 at 211, 343; Pet. Ex. 2 at 6. The results demonstrated mild, intermittent background slowing, suggestive of "mild diffuse encephalopathy". Pet. Ex. 8 at 343. Diffusely increased beta activity observed was characterized as a "nonspecific finding…likely secondary to [the] medication effect [of] the [b]enzodiazepines". *Id*. Multiple myoclonic seizures were recorded without subclinical seizures. *Id*. at 211 & 343. The findings were interpreted as being consistent with myoclonic epilepsy. *Id*. at 343; Pet. Ex. 2 at 6.

*Discharge*

Prior to discharge, social services and CPS implemented a safety plan with V.S.'s parents for ongoing medical care and medication management; her parents were required to sign the plan and were advised that appointments must be kept. Pet. Ex. 8 at 211-213. V.S. was deemed stable for discharge to home with outpatient follow-up set for February 3, 2017. *Id*. at 210-13.

3. <u>Physical Therapy</u>

---

[44] *Lorazepam*, or "Ativan," is a benzodiazepine that may be used to control status epilepticus. *Dorland's* at 1060.

[45] *Neuronal ceroid lipofuscinosis*, or "Batten syndrome," is a genetically and clinically diverse group of neurodegenerative diseases involving the abnormal storage of lipofuscin, a cellular waste product. *Dorland's* at 1049; *see also*, *supra* note 25.

[46] *Omeprazole*, or "Prilosec," is a proton pump inhibitor used in the treatment of gastroesophageal reflux disease. *Dorland's* at 1301.

On February 6, 2017, V.S. was referred to First Steps, an early intervention program that provides services "designed to meet the developmental needs of the child".[47] Pet. Ex. 3 at 66. The referral included various concerns, including seizure disorder, inability to roll over, and limited interest in toys. *Id.* At V.S.'s March 6, 2017 assessment, the need for ongoing physical therapy ("PT"), occupational therapy ("OT"), and speech-language therapy ("SLT") was documented. *Id.* at 1-7. Her parents were notably involved in her therapies, and V.S. made excellent progress. *E.g.*, *id.* at 133-36 (June 1, 2017 progress report indicated that V.S. had completed eight PT sessions and had canceled only two appointments for family vacation), 125-32 (September 1, 2017 progress report of continued PT, OT, and SLT therapy sessions), 117-24 (December 1, 2017 progress report of therapy sessions, including descriptions of skills, such as improved trunk control, need for only limited to moderate assistance when transferring into and out of sitting positions, improved use of left arm, increased vocalizations, and improved responses to gestures).

4. Nine-Month Well-Child Visit and Additional Pediatric Appointments

At her nine-month well-child visit on February 20, 2017, V.S. was noted to be "doing much better." Pet. Ex. 12 at 30. Her parents reported compliance with her antiepileptic medications and the GI care plan. Her gastroesophageal reflux symptoms had reportedly improved. Her parents indicated that they would be following up with neurology due to continued mild tremors. *Id.* NP Renfrow documented continued developmental concerns, including limited motor skills, inability to roll over independently, and a slight head lag when pulled upward. *Id.* at 32. Physical examination was notable for strabismus, tremor, and increased tone in both lower extremities. *Id.* V.S. was noted to be markedly small for her age and sex with a head circumference below the 1st percentile. *Id.* at 30. She was in the 49th percentile for height and the 1st percentile for weight. *Id.*

V.S. was presented on April 5, 2017 for fever and constipation. *Id.* at 34. Her father reported that her tremors remained unchanged from baseline. He indicated that a 15-secondlong seizure-like episode witnessed during the visit was typical for V.S. *Id.* He expressed interest in consulting neurology about the possibility of adjusting V.S.'s antiepileptic medication. *Id.* Examination was otherwise consistent with her February visit. She had left-sided otitis media and amoxicillin was prescribed. *Id.* at 35, 36. Measurements on this date included a height in the 56th percentile and weight in the 1st percentile. *Id.* at 34. Head circumference was not measured. *Id.*

V.S. was presented on May 24, 2017, for her one-year well-child visit. *Id.* at 42-43. She was "doing well" overall. *Id.* at 43. She was in the 2nd percentile for weight, 37th percentile for height, and 1st percentile for head circumference. *Id.* at 42. She had left esotropia, hypertonicity of the lower extremities, and occasional tremors. *Id.* at 44. Her antiepileptic treatment regimen had been followed, and there had been no intervening ED visits or hospitalizations. *Id.* at 42-43. Developmental delays were ongoing. V.S. was receiving PT, could sit briefly with support, and had begun reaching for objects, although concerns were raised regarding the limited use of her

[47] First Steps, *Child Developmental Programs* (2026), https://indianafirststeps.org/program-information/ (last visited Oct. 14, 2026).

left upper extremity. *Id*. Continuation of PT and a neurology follow-up were recommended. *Id*. at 45.

**D. Remainder of 2017 and More Recent Records**

V.S. continued to experience symptoms associated with myoclonic epilepsy, global developmental delay, and gastroesophageal reflux disease, and was treated by various providers. Pet. Ex. 2 at 1-2. Although details of these encounters varied, the overall clinical picture remained consistent: frequent, brief myoclonic jerks without loss of consciousness, and delayed developmental gains without evidence of significant regression. *E.g.*, *id*. at 3. V.S.'s providers considered multiple etiologies before ultimately diagnosing her with global developmental delay and cerebral palsy in the setting of hypoxic-ischemic encephalopathy. *Id*. at 1. There was no mention of her condition being caused by vaccination.

1. Third Hospitalization (June 1-2, 2017) and Third EEG

On June 1, 2017, V.S. was sent to the ED for admission by Dr. Lakhotia, who observed frequent myoclonic jerks during her examination. Pet. Ex. 8 at 489, 505-08. V.S.'s father reported that her jerking episodes persisted daily and involved all extremities without facial involvement or loss of consciousness. *Id*. at 505. He further reported that the episodes appeared worse during the clinic visit, occurring every few minutes, which he attributed to V.S. being upset about being in an unfamiliar environment. *Id*. Her father reported his belief that V.S.'s seizures were the result of her four-month vaccinations. *Id*. She had not received any immunizations since. *Id*.

The admission note summarized V.S.'s previous evaluations, which were extensive but unrevealing; the etiology of her early-onset myoclonic epilepsy remained undetermined. *Id*. Since her previous hospitalization, V.S.'s antiepileptic medications had been gradually titrated upward through regular outpatient neurology follow-up. *Id*. A continuous video EEG monitoring was conducted for approximately 12 hours to "quantify [V.S.'s] daily seizure burden and for parental education." *Id*. at 518, 521-22. The results demonstrated mild background slowing with multiple brief clinical seizures with electrographic correlates, prompting a dose increase of her antiepileptic medicine. *Id*. The record included that her parents had independently modified V.S.'s ketogenic diet regimen and a dietitian was consulted to re-educate her family about the prescribed diet and the importance of strict adherence. *Id*. at 505-06.

At discharge, V.S. was described as alert and fussy, but consolable, with persistent mild axial hypotonia and significant gross motor, fine motor, speech, and cognitive delays. *Id*. 506-08. The assessment of the neurology team was that V.S. had intractable early-onset myoclonic epileptic encephalopathy with global developmental delay of unspecified etiology. *Id*. at 508-09.

2. Transfer of Care and Second MRI Examination

V.S. was first presented to Cincinnati Children's Hospital ("Cincinnati's") on August 9, 2017, and assessed by Dr. Vawter-Lee in the neurology clinic. Pet. Ex. 2 at 2-9. She observed that V.S. experienced several brief myoclonic jerks without loss of consciousness and diagnosed her with intractable myoclonic epilepsy. *Id.* at 5,7. Antiepileptic management was continued, and additional therapy initiated. *Id.* at 8.

A second MRI examination was performed on September 8, 2017. *Id.* at 91-96. An addendum to the report was prepared the following month by the reviewing radiologist, Beth Marie Kline-Fath, M.D., after her receipt of the October 8, 2016 imaging records from Norton, which enabled her to compare the first and second MRI results:

> Since the prior exam, there has been significant progression in myelination. The white matter signal abnormality is *now more evident* on the current September 2017 exam. *Similar to the prior study,* there is thinning of the posterior corpus callosum and decreased volume in the basal ganglia and thalami. The lateral and third ventricles and extraaxial spaces are slightly *more prominent than the prior exam*.

*Id.* at 91 (emphasis added). Dr. Kline-Fath opined that both MRIs were abnormal,[48] and "raise[d] the question for prior ischemic injury," stating that a "neurodegenerative process [was] less likely" to have occurred. *Id.* 91-92. She recommended a follow-up MRI in six months. *Id.* at 92.

3. Follow-up Appointments and Third MRI Examination

At a follow-up visit on October 27, 2017, neurologist, Dr. Barbara E. Hallinan remarked that the most recent neuroimaging indicated that V.S.'s condition was "stable… with a neurodegenerative process felt to be less likely." Pet. Ex. 2 at 134. She further noted that interpretations of the EEG findings had varied between myoclonic seizures and non-epileptic myoclonus but that V.S. likely had both. *Id.* at 134-38. Dr. Hallinan noted V.S.'s continued developmental progress without evidence of developmental regression. *Id.* at 138; *see also* Pet. Ex. 3 at 16, 117-24 (the December 1, 2017 progress report of PT, OT, and SLT therapy sessions from the prior approximately nine-monthlong period, and the January 19, 2018 confirmation of V.S.'s continued eligibility in the First Steps early intervention program).

Included in the record was a January 2018 assessment during which V.S.'s parents reported that Cincinnati's was her home hospital and that she "[did] not have a seizure disorder" as initially diagnosed but was nonetheless taking Keppra and Topamax.[49] Pet. Ex. 3 at 42.

---

[48] At the entitlement hearing, Dr. Kinsbourne testified that the second MRI evidenced "a good amount of abnormality" that may not have been appreciable during the initial MRI examination, opining that "as any baby gets older… lack of myelination becomes more evident." Tr. at 31-32.

[49] *Topiramate*, or "Topamax," is used as an antiepileptic medication in the treatment of partial seizures. *Dorland's* at 1910.

V.S. was returned to Cincinnati's on June 8, 2018, for neurological follow-up. Pet. Ex. 2 at 199-205. Petitioner reported that V.S.'s jerking episodes had become relatively infrequent since the previous year, and reduction of antiepileptic medications appeared to improve both her mood and developmental progress. *Id*. at 200; *see also* Pet. Ex. 3 at 101-08 (June 1, 2018 progress report noting that "[V.S.] is making steady gains with gross motor skills," that she "has recently been weaned off of [levetiracetam] and her attention and alertness has improved."). Due to persistent hypotonia and developmental impairments, Dr. Vawter-Lee diagnosed V.S. with cerebral palsy and made a referral for rehabilitation and additional mobility devices. Pet. Ex. 2 at 204.

A third MRI examination performed on January 8, 2019, demonstrated persistent white matter signal abnormalities associated with white matter volume loss. *Id*. 299-300. The extensive structural abnormalities, which included the thinning or shrinking of cerebral regions, were interpreted as the likely sequelae of a prior insult that was potentially ischemic. *Id*. at 299.

At a follow-up on February 1, 2019, Dr. Vawter-Lee concluded that, based on the three MRI results, a neurodegenerative process was unlikely the cause of V.S.'s abnormalities. *Id*. at 309-10. She concluded that a prenatal insult, despite there being no contemporaneous documentation, was the most likely explanation. *Id*. at 310. Dr. Vawter-Lee also documented her uncertainty about a relationship, if any, between V.S.'s seizures, vaccinations, and neuroimaging findings, writing that it could not be determined retrospectively whether the abnormalities (as seen on MRI) predated seizure onset, whether the vaccinations triggered seizures in a predisposed brain, or whether the abnormalities developed secondary to the seizures themselves. *Id*. She noted that V.S. was "doing well" clinically and approved the discontinuation of antiepileptic medication. *Id*. at 305-11; *see also* Pet. Ex. 3 at 77-84 (March 1, 2019 First Steps progress report documenting gradual developmental progress across all therapy domains, but with persistent and significant delays), 69-76 (May 1, 2019 First Steps progress report, which was made around V.S.'s third birthday, noting improved ambulation with a walker for 10-15 feet, use of sign language to signal "more," and emerging pincer grasp skills.)

No further records were filed.

### E. The Experts' Opinions

Petitioner alleges that V.S.'s seizures and development delay were the result of her October 3, 2016 DTaP, Hib, Prevnar 13, and rotavirus vaccinations. Petition at pmbl. & ¶¶ 3, 6. Petitioner further alleges that V.S. "was a healthy, appropriately developing, seizure free infant" with "no clinical symptoms generated from [her] microcephaly," who "went from being a normal infant… to having severe epilepsy and severe developmental regression and delay" post-vaccination. Pet. Posth'g Reply at 4, 9-10.

Petitioner proposes two general theories: the subject vaccinations triggered the onset of epilepsy leading to developmental delay; and V.S.'s stable pre-existing condition was significantly aggravated by the subject vaccinations, leading to an intractable seizure disorder and developmental delay. *Id*. at 2.

Petitioner's theories focus on two potential causation mechanisms: the subject vaccinations triggered the production of cytokines,[50] which acted on V.S.'s hippocampus, causing seizures in the absence of fever; and/or the subject vaccinations triggered a stress response, which caused seizures in a child without Dravet syndrome (or any other comparable genetic diagnosis). *Id*. at 6-7.

Petitioner retained Dr. Kinsbourne, who provided an expert report and testimony during the February 15, 2023 entitlement hearing. Pet. Ex. 15; Tr. at 6-87. In response, respondent retained Dr. Shinnar, who authored an expert report, and Dr. Holmes, who provided an expert report as well as testimony at the entitlement hearing. Resp. Ex. A; Resp. Ex. C; Tr. at 93-146.

1. <u>Dr. Kinsbourne's Expert Report and Testimony</u>

Dr. Kinsbourne opined to a reasonable degree of medical probability that the subject vaccinations administered to V.S. acted as a trigger for the development of a seizure disorder that significantly slowed her mental and motor development and severely aggravated her preexisting microcephaly. Pet. Ex. 15; Tr. at 6-87. Dr. Kinsbourne acknowledged that V.S. had microcephaly and structural brain abnormalities, which he attributed to a prenatal event, but opined that her seizure disorder began after she received the subject vaccinations, which independently contributed to her developmental impairment. Pet. Ex. 15 at 5-9.

According to Dr. Kinsbourne, V.S.'s microcephaly, prominent occiput, and overlapping skull bones were evidence of prenatal destruction of brain tissue. *Id*. at 5; Tr. at 24. He explained that the skull ordinarily grows in response to brain growth and that V.S.'s overlapping bones suggested that her skull had partially collapsed after suffering a loss of the underlying brain tissue in utero. *Id*. He characterized the resulting abnormality as a static, structural condition that did not affect V.S.'s functioning during her first months of life. *Id*. Citing *Russell et al*.,[51] Dr. Kinsbourne provided additional support for his opinion that V.S.'s skull configuration was consistent with partial prenatal brain destruction, potentially resulting from a disruption of the fetal blood supply. Pet. Ex. 15 at 5.

Dr. Kinsbourne acknowledged that V.S.'s medical records did not identify a cause for her epilepsy apart from microcephaly and the structural brain abnormalities associated with an intrauterine injury. Tr. at 28-29, 84 (Dr. Kinsbourne stated "… no evidence was found for anything other than structural brain abnormality. This brain abnormality structure would be consistent with microcephaly… and some event during the pregnancy which destroyed some

[50] *Cytokines* are signaling proteins released by immune cells that regulate inflammatory and immune responses and facilitate communication between cells. *Dorland's* at 460. *Interleukins* are a class of cytokines that mediate interactions among certain cells and can exert either proinflammatory or anti-inflammatory effects, depending on the particular interleukin and biological context. *Id*. at 937.

[51] Laura J. Russell et al., *In Utero Brain Destruction Resulting in Collapse of the Fetal Skull, Microcephaly, Scalp Rugae, and Neurologic Impairment: The Fetal Brain Disruption Sequence*, 17 American J. of Medical Genetics 509 (1984), filed as "Pet. Ex. 24".

aspect of [V.S.'s] brain… it's very clear that the epilepsy is not genetic. Nobody has suggested in the record at any point that [V.S.] had a genetic epilepsy. It's perfectly clear that it was a structural epilepsy, in her case caused by a prenatal structural mishap.").

Dr. Kinsbourne acknowledged that children with microcephaly have increased rates of developmental disability, abnormal neuroimaging, and epilepsy. *Id*. He cited to *Aggarwal et al.*,[52] which reported epilepsy in approximately 42.9% of children with microcephaly and developmental delay, and to *Ashwal et al.*,[53] which associated severe microcephaly with an 80% likelihood of imaging abnormalities, severe developmental disability, and difficult-to-control epilepsy. *Id*. Yet, in Dr. Kinsbourne's opinion, although V.S.'s prenatal brain injury may have given rise to seizure susceptibility, it did not make her development of epilepsy inevitable,[54] emphasizing that she had no neonatal seizures and was seizure-free for approximately the first four months of life. *Id*. at 6, 8.

Therefore, Dr. Kinsbourne opined that the October 3, 2016 vaccinations—particularly the DTaP and Prevnar 13 vaccines—[55] triggered the abrupt onset of myoclonic seizures within hours of administration. Pet. Ex. 15 at 6–8. He cited to *Sun et al.*, and *Matin et al.*,[56] indicating that seizure risk following DTaP vaccination is greatest during the first several post-vaccination days and that the innate immune response can be activated within hours of an immunologic challenge. *Id*. at 6. Dr. Kinsbourne also discussed *Le Saux et al.*,[57] an active surveillance study of post-vaccination seizures that was conducted while twelve hospitals transitioned from administering whole-cell to acellular pertussis vaccines. Tr. at 58-59. He acknowledged that the study lacked the evidentiary "heft" of a controlled epidemiological investigation but maintained that it

---

[52] Anju Aggarwal et al., *Clinical Profile of Children with Developmental Delay and Microcephaly*, 4 J. Neurosciences Rural Practice 288 (2013), filed as "Pet. Ex. 17".

[53] Ashwal et al., *supra* note 13.

[54] *See* Frances E. Jensen & Tallie Z. Baram, *Developmental Seizures Induced by Common Early-Life Insults: Short- and Long-Term Effects on Seizure Susceptibility*, 6 Mental Retardation & Dev. Disabilities Research Reviews 253 at 6 (2000), filed as "Pet. Ex. 22" (noting that "susceptibility to seizures in response to pathologic stimuli is clearly higher in the immature brain than in the adult both clinically and in experimental models.").

[55] Tr. at 76.

[56] Yuelian Sun et at., *Risk of Febrile Seizures and Epilepsy After Vaccination with Diphtheria, Tetanus, Acellular Pertussis, Inactivated Poliovirus, and Haemophilus Influenzae Type B*, 307 JAMA 823 at 1, 9 (2012), filed as "Pet. Ex. 28" and as "Resp. Ex. E, Tab 9" (finding that DTaP-IPV-Hib vaccination was associated with an increased risk of specifically febrile seizures on the day of vaccination, although the absolute risk was found to be "very low"); Nassim Matin et al., *Epilepsy and Innate Immune System: A Possible Immunogenic Predisposition and Related Therapeutic Implications*, 11 Human Vaccines & Immunotherapeutics 2021 at 6 (2015), filed as "Pet. Ex. 23" (finding that immune-mediated cytokines may decrease seizure thresholds and extend aberrant neuronal firings among neurons).

[57] Nicole Le Saux et al., *Decrease in Hospital Admissions for Febrile Seizures and Reports of Hypotonic-Hyporesponsive Episodes Presenting to Hospital Emergency Departments Since Switching to Acellular Pertussis Vaccine in Canada: A Report From IMPACT*, 112 Pediatrics 348 (2003), filed as "Pet. Ex. 40". This article was filed after the parties' experts submitted their reports and prior to the entitlement hearing; Dr. Kinsbourne briefly discussed *Le Saux et al.* as part of his live testimony.

demonstrated that febrile and afebrile seizures continued to be reported after adoption of the acellular pertussis vaccine. *See also id.* at 128 (Dr. Holmes explained that "because one shows that the acellular pertussis is safer than the cellular pertussis doesn't mean that the acellular pertussis causes afebrile seizures.").

Relying on *Wise et al.*,[58] which analyzed passive surveillance data, Dr. Kinsbourne opined that "the Prevnar vaccine… is capable of trigging seizures… within a day or two of receipt." Tr. at 58. He asserted that, among the cases described in the survey, afebrile seizures were more commonly reported than febrile seizures were.[59] For additional support, he cited *von Spiczak et al.*,[60] which also analyzed passive surveillance data, and highlighted that both febrile and afebrile seizures were reported following vaccination, with the greatest frequency during the first 24 hours after receipt of an inactivated vaccine. *Id.*

Dr. Kinsbourne opined that fever was not necessary for vaccination to trigger a seizure in a susceptible child. Pet. Ex. 15 at 6–7. He cited to *Verbeek et al.*,[61] which reported vaccine-associated afebrile seizures, as well as to *Cendes and Sankar*,[62] *Scheffer*,[63] and *McIntosh et al.*, [64]

[58] Robert P. Wise et al., *Postlicensure Safety Surveillance for 7-Valent Pneumococcal Conjugate Vaccine*, 292 JAMA 1702 (2004), filed as "Pet. Ex. 39". Of note, this article examined 4,154 adverse-event reports following administration of the pneumococcal 7-valent conjugate vaccine, which is a predecessor to one of the vaccines at issue here—the pneumococcal 13-valent conjugate vaccine. *See* Pet. Ex. 10 at 1 (vaccination record). Additionally, this article was filed after the parties' experts submitted their reports and prior to the entitlement hearing; Dr. Kinsbourne briefly discussed *Wise et al.* as part of his live testimony.

[59] The authors note that approximately 94 of the total 393 cases reporting convulsions after receipt of the vaccine were described as "febrile seizures," and 130 of the remaining cases also reported fever in addition to convulsions, which suggests that a majority of the cases did not report strictly afebrile seizures. Pet. Ex. 39 at 3 (Wise et al., *supra* note 58). Additionally, the authors stated that "[a]mong the first 98 patients with reported seizures, supplementary follow-up disclosed that 79 (80.6%) had a prior history of seizure or a fever at the time of the seizure", which suggests that some of the cases reporting afebrile seizures may have had a preexisting seizure disorder. *Id.* at 5.

[60] Sarah von Spiczak et al., *A Retrospective Population-Based Study on Seizures Related to Childhood Vaccination*, 52 Epilepsia 1506 at 4 (2011), filed as "Pet. Ex. 30" and as "Resp. Ex. E, Tab 8" (concluding that their data obtained from passive surveillance was insufficient to generate any incidences or relative risks of certain epilepsy syndromes in relationship to vaccination).

[61] Verbeek et al., *supra* note 9, at 6-7 (analyzing a cohort of patients, some of whom reported afebrile seizures occurring post-vaccination).

[62] Cendes & Sankar, *supra* note 9 (discussing febrile seizures as well as afebrile seizures experienced by some children diagnosed with Dravet syndrome).

[63] Ingrid E. Scheffer, *Vaccination Triggers, Rather Than Causes, Seizures*, 15 Epilepsy Currents 335 (2015), filed as "Pet. Ex. 25" (commenting on post-vaccination afebrile seizures in children with Dravet syndrome or other genetic abnormalities, and thus proposing vaccination as a trigger in genetically susceptible children rather than as an independent cause of epilepsy).

[64] Anne M. McIntosh et al., *Effects of Vaccination on Onset and Outcome of Dravet Syndrome: A Retrospective Study*, 9 Lancet Neurology 592 (2010), filed as "Pet. Ex. 42" and as "Resp. Ex. E, Tab 14" (finding that "[v]accination might trigger earlier onset of Dravet syndrome in children who, because of an SCN1A mutation, are destined to develop the disease."). *McIntosh et al.* was filed by petitioner after Dr. Kinsbourne submitted his report, prior to the entitlement hearing; Dr. Kinsbourne briefly discussed it as part of his live testimony. Tr. at 62-63.

which reported that for children with Dravet syndrome, vaccination may trigger seizures due to a genetically-lowered seizure threshold even without fever. *Id*. Dr. Kinsbourne clarified that V.S. did not have Dravet syndrome or any other analogous genetic mutation but he used Dravet syndrome to draw an analogy between the lowered seizure threshold resulting from genetic mutation and the lowered seizure threshold that he opined resulted from V.S.'s structural brain abnormalities. *Id*.

Dr. Kinsbourne then proposed that the innate immune response following V.S.'s receipt of the subject vaccinations likely triggered her epilepsy, principally through the production of cytokines in the absence of fever. *Id*. at 7. During the hearing, he further developed the proffered mechanism by way of discussing *Mazarati*,[65] which is a commentary responding to another article[66] (referred to at the entitlement hearing as "*Dube*") that was not filed in this matter. Tr. at 64-68, 78-82. Dr. Kinsbourne testified at length about a figure contained therein, copied below, which he characterized as "explaining visually what *Dube* said in words":




**FIGURE 1.** Cytokines are a concurrent component of fever and seizures Exogenous pyrogenic factors (e.g., lipopolysaccharide) or hyperthermia lead to fever by acting at Toll-like receptors and through the induction of cytokines. Cytokines facilitate seizures through phosphorylation of the NR2A/B subunit of *N*-methyl-D-aspartate receptors and via prostaglandin $E_2$, an endogenous cytokine-induced pyrogen. Seizures, in turn, lead to the expression of cytokines in the brain, thus forming a vicious circle that contributes to seizure progression. $PGE_2$, Prostaglandin $E_2$; LPS, lipopolysaccharide.

---

[65] Andrey M. Mazarati, *Cytokines: A Link Between Fever and Seizures*, 5 Epilepsy Currents 169 (2005), filed as "Pet. Ex. 43". This article was filed after the parties' experts submitted their reports and prior to the entitlement hearing; Dr. Kinsbourne discussed *Mazarati* as part of his live testimony.

[66] Mazarati, *supra* note 65, responds to C. Dube et al., *Interleukin-1β Contributes to the Generation of Experimental Febrile Seizures*, 57 Annals Neurology 152 (2005).

Tr. at 79; Pet. Ex. 43 at 2.[67] Notably, *Mazarati* discussed results of experiments that simulated infection (by injecting mice with lipopolysaccharide) and fever (by sustaining prolonged hyperthermia).[68] Although Dr. Kinsbourne could not recall whether the authors in *Dube* ever addressed vaccinations, he drew a connection between their findings and this matter by equating infection with vaccination. Tr. at 65, 79-80; *see also* Pet. Ex. 43.[69] Succinctly, Dr. Kinsbourne asserted that *Mazarati* supported his opinion that vaccinations can stimulate the production of cytokines, which in turn can engender afebrile seizures.

Dr. Kinsbourne opined that seizures have the potential to further stimulate cytokine production and additional seizures (i.e. that seizures beget seizures), which can trigger epilepsy in a predisposed child. Tr. at 81-82; Pet. Ex. 15 at 7, 8. He asserted that this opinion is shared among other experts and epileptologists. *Id*. When asked to identify the specific evidence supporting his opinion that seizures beget seizures, Dr. Kinsbourne stated that he was "relying on what experts like Dr. Holmes conclude from their research." Tr. at 82.

Dr. Kinsbourne next discussed the residual effects of the alleged injury, citing *Stafstrom*,[70] which associates early life seizures with long-term behavioral and cognitive consequences in experimental animal models, and opined that V.S.'s recurrent, difficult-to-control seizures adversely affected her subsequent development. Pet. Ex. 15 at 7–8. Relying on *Ben-Ari & Holmes*,[71] *Sutula*,[72] *Glass et al.*,[73] and *Holmes*,[74] Dr. Kinsbourne explained that

---

[67] Mazarati, *supra* note 65.

[68] Mazarati, *supra* note 65. *Lipopolysaccharide* is a molecule and a major component of the cell wall of gram-negative bacteria that is commonly used in laboratory immunology. *Dorland's* at 1050-51.

[69] Mazarati, *supra* note 65.

[70] Carl E. Stafstrom, *Assessing the Behavioral and Cognitive Effects of Seizures on the Developing Brain*, 135 Progress in Brain Research 377 (2002), filed as "Pet. Ex. 44" (abstract and article) (discussing results from experiments conducted with animal models); *see also* Carl E. Stafstrom, *Assessing the Behavioral and Cognitive Effects of Seizures on the Developing Brain*, 135 Progress in Brain Research 377 (2002), filed as "Pet. Ex. 26" (abstract only).

[71] Yehezkel Ben-Ari & Gregory L. Holmes, *Effects of Seizures on Developmental Processes in the Immature Brain*, 5 Lancet Neurology 1055 at 2 (2006), filed as "Pet. Ex. 19" (finding that seizures may modify developing neuronal networks and lead to persistent deleterious effects).

[72] Thomas P. Sutula, *Mechanisms of Epilepsy Progression: Current Perspective from Neuroplasticity in Adulthood and Development*, 60 Epilepsy Research 161 at 8 (2004), filed as "Pet. Ex. 45" (abstract and article) (finding that while epilepsy is a heterogeneous disorder and that not all epileptic syndromes are progressive, inadequately controlled epilepsy early in life may lead to long-term behavioral and cognitive consequences); *see also* Thomas P. Sutula, *Mechanisms of Epilepsy Progression: Current Perspective from Neuroplasticity in Adulthood and Development*, 60 Epilepsy Research 161 (2004), filed as "Pet. Ex. 27" (abstract only).

[73] Hannah C. Glass et al., *Clinical Neonatal Seizures are Independently Associated with Outcome in Infants at Risk for Hypoxic-Ischemic Brain Injury*, 155 J. Pediatrics 318 at 6 (2009), filed as "Pet. Ex. 21" (finding an association between clinical neonatal seizures and adverse long-term neurodevelopmental outcomes that is independent of the severity of birth asphyxia).

[74] Gregory L. Holmes, *Cognitive Impairment in Epilepsy: The Role of Network Abnormalities*, 17 Epileptic Disorders 101 at 4 (2015), filed as "Pet. Ex. 41" (noting that "[w]hile the cause of the seizure clearly contributes to

seizures occurring in early life can alter developing neural networks and produce lasting consequences, separate from the effects of an underlying structural injury. *Id*. In his view, the abrupt onset, persistence, and medication-resistant nature of V.S.'s seizure disorder more likely than not contributed significantly to the slow rate at which she subsequently acquired psychomotor skills. *Id*. at 8.

Dr. Kinsbourne concluded that V.S. had sustained "destructive prenatal brain damage" with microcephaly, which lowered her seizure threshold; that her four-month vaccinations triggered the onset of a severe myoclonic seizure disorder within a medically reasonable time interval and without a viable alternative cause; and that the resulting epilepsy substantially worsened the developmental course associated with her preexisting, intrauterine injury. *Id*. at 8. In sum, Dr. Kinsbourne found that V.S.'s four-month vaccinations caused a seizure disorder that significantly aggravated her previous condition. *Id*. at 9.

### 2. Dr. Shinnar's Expert Report

Respondent initially retained Dr. Shinnar, who submitted an expert report. Resp. Ex. A. Dr. Shinnar based his opinions on his review of the available medical records, the items of medical literature, and his experience in epilepsy research and clinical practice. *Id*. at 1. He did not personally examine V.S. or review the original EEG or MRI studies; he relied on the results documented in the medical records. *Id*.

Dr. Shinnar agreed that V.S.'s correct diagnosis was epilepsy. Resp. Ex. A at 3. He explained that epilepsy commonly begins during childhood, and onset often occurs within the first year of life,[75] raising the question of whether onset of epilepsy occurring post-vaccination is merely coincidental in this matter. *Id*. Dr. Shinnar added that many cases of epilepsy have no identifiable cause.[76]

In this case, however, he asserted that V.S.'s epilepsy was structural and secondary to an antenatal brain injury. *Id*. Because V.S. was microcephalic at birth, and her neuroimaging findings were suggestive of preexisting structural abnormalities, Dr. Shinnar reasoned that the underlying injury necessarily occurred before birth. *Id*. Dr. Shinnar added that V.S. underwent extensive genetic testing, which identified several variants of genes associated with neurologic

---

cognitive outcome, there is abundant evidence both in humans and animal models that seizures independent of etiology worsen cognitive outcome") (citations omitted).

[75] Shlomo Shinnar & John M. Pellock, *Update On The Epidemiology And Prognosis Of Pediatric Epilepsy*, 17 J. Child Neurology S4 at 2 (2002), filed as "Resp. Ex. A, Tab 2" (finding that children in their first year of life are at the highest risk for developing epilepsy); *see also* Institute of Medicine, *Epilepsy Across the Spectrum: Promoting Health and Understanding*, 56 (Mary Jane England et al., eds., 2012), filed as filed as "Resp. Ex. A, Tab 1".

[76] *See* International League Against Epilepsy, *Guidelines for Epidemiologic Studies on Epilepsy*, 34 Epilepsia 592 at 3 (1993), filed as "Resp. Ex. A, Tab 3"; Ingrid E. Scheffer et al., *ILAE Classification of the Epilepsies: Position Paper of the ILAE Commission for Classification and Terminology*, 58 Epilepsia 512 at 5-6 (2017), filed as "Resp. Ex. A, Tab 4".

abnormalities or epilepsy, but none of the variants provided a clear, genetic-based diagnostic explanation for her condition. *Id.*

Dr. Shinnar attributed V.S.'s epilepsy as well as her developmental delay to the prenatal injury that had impaired her brain growth and resulted in microcephaly. *Id.* He acknowledged that her developmental delay became apparent only as she grew older, characterizing her later manifestation as "typical" for a child with such a clinical history. *Id.*

Dr. Shinnar disagreed that the subject vaccinations could trigger epilepsy in a child with preexisting susceptibility, arguing that no scientific evidence supports that theory. *Id.* Further, he asserted that Dr. Kinsbourne "mischaracterize[d] the medical literature." *Id.* For example, Dr. Shinnar referenced literature[77] that found that the DTaP vaccine does not carry an increased risk of epilepsy. *Id.*

Dr. Shinnar also noted that V.S.'s treating physicians documented the temporal proximity of the subject vaccinations and her initial seizures but did not attribute her epilepsy to the vaccinations. *Id.* He maintained that the references to vaccination in the medical records related to the chronology of events rather than an opinion regarding causation. *Id.*

Dr. Shinnar concluded, within a reasonable degree of medical certainty, that V.S.'s epilepsy, developmental delay, and associated cognitive or behavioral difficulties were unrelated to her October 3, 2016 vaccinations, but instead were the result of a prenatal injury that impaired brain growth, produced congenital microcephaly, and later manifested as both epilepsy and developmental disability. *Id.*

### 3. Dr. Holmes' Expert Report and Testimony

Respondent thereafter retained Dr. Holmes, who submitted an expert report and testified at the entitlement hearing. Resp. Ex. C; Tr. at 93–146. Dr. Holmes opined that V.S. has congenital encephalopathy, evidenced by severe microcephaly, which accounted for both her epilepsy and developmental delay. Resp. Ex. C at 6, 9. In his opinion, V.S.'s developmental trajectory, physical and neurologic examinations, neuroimaging, and EEG findings were all consistent with a prenatal brain injury; vaccinations played no role in her condition. *Id.* at 6.

Dr. Holmes defined microcephaly as an occipitofrontal head circumference below the 3rd percentile or more than two standard deviations below the mean for the child's age, sex, and ethnicity. Resp. Ex. C at 6; Tr. at 102–103. V.S.'s head circumference measured more than three

[77] Institute of Medicine, *Adverse Effects of Vaccines: Evidence and Causality*, 573 (Kathleen Stratton, et al., eds., 2012), filed as "Resp. Ex. A, Tab 5" and as "Resp. Ex. E, Tab 6" ("The evidence is inadequate to accept or reject a causal relationship between diphtheria toxoid–, tetanus toxoid–, or acellular pertussis–containing vaccine and seizures."); Wan-Ting Huang et al., L*ack of Association Between Acellular Pertussis Vaccine and Seizures in Early Childhood*, 126 Pediatrics 263 at 6 (2010), filed as "Resp. Ex. A, Tab 6" and as "Resp. Ex. E, Tab 7" ("Among children aged 6 weeks to 23 months, no increased risk for seizures in the 0 to 3 days after DTaP vaccination was observed.".

standard deviations below the mean. V.S.'s microcephaly was severe.[78] Resp. Ex. C at 6. He explained that microcephaly is a function of reduced brain volume and is frequently associated with intellectual or motor disability.[79] *Id*. While genetic and environmental conditions may interfere with prenatal brain growth and produce microcephaly, the precise cause of V.S.'s microcephaly was not identified through genetic testing or neuroimaging.[80] *Id*. Regardless, he considered it likely that the same congenital condition that was responsible for her microcephaly also produced her developmental delay and epilepsy. *Id*.; Tr. at 102, 106.

Dr. Holmes continued that V.S.'s prenatal brain injury placed her at substantial risk for both epilepsy and developmental impairment. Resp. Ex. C at 7. He did not agree that the record established that V.S. had a low seizure threshold and challenged the premise that she had by pointing out that V.S. did not have seizures when her immune system was challenged by her previous vaccinations (e.g. her two-month vaccinations) or by her upper respiratory infection the week before her four-month vaccinations. *Id*. Dr. Holmes therefore questioned why the four-month vaccinations would have triggered seizures due to an allegedly low threshold when the proceeding challenges had not. *Id*., *see also* Tr. at 133-134.

Dr. Holmes disagreed with Dr. Kinsbourne that "'[t]he literature on seizures *associated with microcephaly* uniformly describes them as presenting within hours or a day or two after delivery'" Resp. Ex. C at 9 (citing Pet. Ex. 15 at 8 (emphasis added)). Dr. Holmes asserted that *Glass et al*.,[81] relied on by Dr. Kinsbourne, studied patients who suffered hypoxic-ischemic brain injuries,[82] not patients with microcephaly, and therefore did not support the proposition. Resp. Ex. C at 9.

Dr. Holmes also disagreed that "'[t]he fact that [V.S.] was seizure-free for as long as four months would seem to have predicted that epilepsy would not be a feature of her prenatal encephalopathy.'" Resp. Ex. C at 9 (citing Pet. Ex. 15 at 8). Rather, Dr. Holmes explained that microcephaly is a heterogenous condition with a risk of seizure that depends partly on the underlying cause of microcephaly. Tr. at 103. He added that epilepsy commonly emerges during the first year of life but may begin at any time from infancy through adulthood.[83] Tr. at 104-105.

---

[78] Maja von der Hagen et al., *Diagnostic Approach to Microcephaly in Childhood: A Two-Center Study and Review of the Literature*, 56 Developmental Medicine Child Neurology 732 at 1 (2014), filed as "Resp. Ex. E, Tab 1".

[79] von der Hagen et al., *supra* note 78, at 1, 4.

[80] *See also* Ghada M. H. Abdel-Salam et al., *Association of Epilepsy with Different Groups of Microcephaly*, 42 Developmental Medicine Child Neurology 760 (2000), filed as "Resp. Ex. E, Tab 2"; A. James Barkovich et al., *Malformations of Cortical Development and Epilepsy*, 5 Cold Spring Harbor Perspectives Medicine 1 (2015), "Resp. Ex. E, Tab 3".

[81] Glass et al., *supra* note 73.

[82] *Hypoxic-ischemic encephalopathy* results from asphyxia presumed to have occurred pre- or perinatally and commonly results in feeding difficulties and convulsions; serious cases may involve spastic motor deficits such as cerebral palsy. *Dorland's* at 608.

[83] Abdel-Salam et al., *supra* note 80 at 3 (finding that the age of onset of epilepsy in 55.6% of children with microcephaly was under one year of age); Barkovich et al., *supra* note 80 at 11.

Further, seizure onset in the immediate newborn period is comparatively uncommon, which undermines the suggestion that V.S. being seizure-free for the first four months of life meaningfully distinguished her from other children with prenatal brain abnormalities. *Id*. Dr. Holmes opined that V.S.'s seizures which reportedly began only hours after vaccination were more likely than not coincidental and that the temporal association did not reflect an immune-mediated cause. *Id*. at 119.

Dr. Holmes discussed whether an association exists between vaccinations and seizures or epilepsy. Resp. Ex. C at 7-8. He disagreed with Dr. Kinsbourne's characterization of the findings of *von Spiczak et al*.,[84] which retrospectively reviewed reports of seizures following immunization, as being "strongly indicative of a causal rather than coincidental relationship between vaccination… and… seizure onset" because a non-vaccinated control group was not studied. *Id*. at 7 (quoting Pet. Ex. 15 at 6). Therefore, the study demonstrated only temporal relationships among the reported events but not causal relationships between vaccinations and seizures or onset of epilepsy. *Id*.; *see also* Tr. at 121.

Dr. Holmes questioned the relevancy of *Cendes & Sankar*,[85] which focused on the clinical presentations of patients with Dravet syndrome. Dr. Kinsbourne relied on it to support vaccination as a trigger for afebrile seizures. Resp. Ex. C at 7 (quoting Pet. Ex. 15 at 7). Referring to *Cendes & Sankar*'s[86] source documentation, Dr. Holmes asserted that it "does not support the contention" that vaccination increases the risk of afebrile seizures. Resp. Ex. C at 7-8; Tr. at 122-124. He stated that one of its three principal sources, *Farrington et al*.,[87] evaluated only febrile seizures, as opposed to afebrile seizures. Resp. Ex. C at 7. Another principle supporting source in *Cendes & Sankar*'s[88] was *Vestergaard et al*.,[89] which found an increased risk of febrile seizures following receipt of the measles, mumps, and rubella ("MMR") vaccine—a vaccine that is not at issue here. *Id*. A third principle source, *Barlow et al*.,[90] reported no increased risk of afebrile seizures following vaccination. *Id*.

---

[84] von Spiczak et al., *supra* note 60 at 4.

[85] Cendes & Sankar, *supra* note 9 at 2 ("Vaccination does trigger the onset of seizures in one third of *patients with Dravet syndrome*. Some patients do not have a fever, suggesting that fever per se is not the mechanism responsible for triggering seizures.") (emphasis added).

[86] Cendes & Sankar, *supra* note 9.

[87] Paddy Farrington et al., *A New Method for Active Surveillance of Adverse Events from Diphtheria/Tetanus/Pertussis and Measles/Mumps/Rubella Vaccines*, 345 Lancet 567 (1995), filed as "Resp. Ex. E, Tab 11".

[88] Cendes & Sankar, *supra* note 9.

[89] Mogens Vestergaard et al., *MMR Vaccination and Febrile Seizures: Evaluation of Susceptible Subgroups and Long-Term Prognosis*, 292 JAMA 351 at 1 (2004), filed as "Resp. Ex. E, Tab 13" (finding the rate of febrile seizures increases following measles, mumps, and rubella vaccination).

[90] William E. Barlow et al., *The Risk of Seizures After Receipt of Whole-Cell Pertussis or Measles, Mumps, and Rubella Vaccine*, 345 New England J. Medicine 656 at 1 (2001), filed as "Resp. Ex. E, Tab 12" (finding that neither receipt of the diphtheria, tetanus, and whole-cell pertussis vaccine nor receipt of the MMR vaccine was associated with an increased risk of nonfebrile seizures).

Dr. Holmes also characterized any link between the DTaP vaccine and seizures as "weak."[91] *Id*. at 7-8. He noted that *Sun et al.*[92] reported an association between DTaP and febrile seizures, but no increased risk of epilepsy following DTaP-IPV-Hib vaccination. *Id*.; Tr. at 121-122.

As for Dravet syndrome being a source of support for the proposition that vaccines induce afebrile seizures, Dr. Holmes asserted Dravet syndrome children have an underlying genetic mutation affecting sodium channels, predisposing them to epilepsy. Resp. Ex. C at 8. Any stressor, including vaccination, may provoke seizures in a child with Dravet syndrome, but the child's genetic mutation, rather than the stressor, is responsible for the development of epilepsy, its expression, and the child's ultimate prognosis. *Id*.

Dr. Holmes referenced *McIntosh et al*.,[93] which observed a temporal relationship of vaccination on children with Dravet syndrome. *Id*. Vaccination appeared to shift the age of onset earlier than that of children with distant immunization; however, no apparent effect on outcome among the cohort was observed, leading *McIntosh et al*.[94] to conclude that "there is no rational basis for withholding [vaccination] for fear of causing Dravet syndrome or injuring the brain by a direct or presumed immune mediated mechanism." *Id*. Regardless, V.S. was not diagnosed with Dravet syndrome or any comparable channelopathy, therefore reports of children with Dravet syndrome suffering afebrile seizures provides no support that V.S.'s initial afebrile seizure was caused by the vaccine or was immune-mediated. *Id*.; *see also* Tr. at 117-20.

Dr. Holmes then turned to *Verbeek et al*.,[95] which examined epilepsy onset in temporal proximity to vaccination. Resp. Ex. C at 8. Dr. Holmes emphasized that the study[96] found that genetic or structural abnormalities accounted for nearly all of the reports of epilepsy with onset after vaccination, including reports of children with preexisting encephalopathy. *Id*. Dr. Holmes offered the study as support that V.S.'s underlying structural abnormalities, not the vaccinations, gave rise to her condition. *Id*. Dr. Holmes also asserted that neither *Verbeek et al.*[97] nor Dr. Kinsbourne's report explained how activation of the innate immune system by vaccination could produce seizures in the absence of fever. *Id*.; *see also* Tr. at 124-125. Further, Dr. Kinsbourne

---

[91] *See* Institute of Medicine, *Adverse Effects of Vaccines: Evidence and Causality*, *supra* note 77 at 568-73; Huang et al., *supra* note 77 at 6.

[92] Sun et al., *supra* note 56.

[93] McIntosh et al., *supra* note 64.

[94] McIntosh et al., *supra* note 64 at 6.

[95] Verbeek et al., *supra* note 9.

[96] Verbeek et al., *supra* note 9.

[97] Verbeek et al., *supra* note 9.

failed to explain how activation of the innate immune system following vaccination could produce multifocal myoclonic seizures within hours. Resp. Ex. C at 9.

During the hearing and after Dr. Kinsbourne elaborated on his proposed cytokine-mediated mechanism, Dr. Holmes testified that the cited literature did not offer support for the contention that routine peripheral vaccination could produce the degree of cytokine activity necessary to cause the neurologic effects that Dr. Kinsbourne had proposed. Tr. at 125. Referring to the *Mazarati* commentary[98] and the unfiled *Dube* article,[99] Dr. Holmes testified that the *Dube* authors had not demonstrated that peripheral immunization can produce such substantial elevations in interleukins, or cytokines. Tr. at 127.

Dr. Holmes then pointed to V.S.'s clinical testing in the days following vaccination, which did not show that she had suffered a cytokine-mediated inflammatory injury to the brain or that there was a "massive cytokine invasion" of the brain sufficient to cause her seizures. *Id*. at 127. He added that if an inflammatory process had occurred, there would have been corresponding abnormalities on neuroimaging and EEG testing. Specifically, substantial cytokine-mediated inflammation would be expected to produce "signal changes in the cortex" on MRI and a "more diffuse" pattern of slowing or "generalized abnormalities" on EEG. *Id*. at 130-131, 132-133. V.S.'s studies did not show any of these features. Dr. Holmes concluded that the MRI and EEG findings were not consistent with the type of inflammatory process proposed by Dr. Kinsbourne. *Id*. at 130-131. Succinctly, a substantial cytokine-mediated brain injury would be expected to produce a more diffuse or generalized neurologic disturbance, not abnormalities confined to multiple discrete focal regions. *Id*. at 132-133.

Dr. Holmes also disputed Dr. Kinsbourne's application of the idea that *seizures beget seizures*.[100] He explained that V.S.'s first seizure did not trigger a cascade leading to the second, nor did the second cause the third. Tr. at 136-139. Rather, once V.S. developed spontaneous recurrent afebrile seizures, she met the clinical pattern of epilepsy: an underlying brain disorder producing an ongoing propensity for recurrent seizures without the need for a new external trigger, such as fever, infection, or vaccination. *Id*. In Dr. Holmes's view, the recurrence of V.S.'s seizures therefore reflected a manifestation of her underlying epileptic disease process, not a progressively increasing susceptibility created by the preceding seizures. *Id*.

Dr. Holmes agreed that frequent, pharmacoresistant seizures during early childhood can adversely affect cognition, particularly in the developing brain.[101] Resp. Ex. C at 8-9. He

---

[98] Mazarati, *supra* note 65.

[99] *See supra* note 66.

[100] *See also* Tr. at 82 (Dr. Kinsbourne, having been asked what evidence supported the proposition that seizures beget seizures, identifying Dr. Holmes's scholarship as one source on which he relied).

[101] Jonathan K. Kleen et al., *Cognitive and Behavioral Co-Morbidities of Epilepsy*, *in* Jasper's Basic Mechanisms of the Epilepsies 915 at 11-12 (4th ed. 2012), filed as "Resp. Ex. E, Tab 16" (explaining that, although cognitive deficits reflect the underlying cause of epilepsy, recurrent seizures and interictal discharges can produce additional potentially reversible impairment, particularly in the developing brain); Anne T. Berg et al., *Age at Onset of Epilepsy, Pharmacoresistance, and Cognitive Outcomes: A Prospective Cohort Study*, 79 Neurology 1384 at 1 (2012), filed as "Resp. Ex. E, Tab 17" (finding that uncontrolled seizures have the greatest cognitive impact in

nevertheless distinguished that general principle from V.S.'s case, explaining that among children with microcephaly, the underlying brain abnormality is typically the principal determinant of cognition outcome. *Id*. He therefore attributed V.S.'s developmental delay to the prenatal brain condition that caused her microcephaly and epilepsy, rather than to the seizures themselves. *Id*. at 9; Tr. at 128.

Dr. Holmes concluded, to a high degree of medical certainty, that V.S.'s prenatal injury, congenital encephalopathy, and resulting microcephaly caused her epilepsy and impaired development. *Id*. at 9. There is no evidence to support that vaccinations can cause epilepsy or its sequelae. *Id*.

## V. <u>Standards of Adjudication</u>

A petitioner is required to establish her case by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [they] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between *preponderant evidence* and *medical certainty* is important because a special master should not impose an evidentiary burden that is too high. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing a special master's decision that petitioners were not entitled to compensation); *see also Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357 (Fed. Cir. 2000); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with the dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

### A. Legal Standard Regarding Causation

The Vaccine Act provides two avenues for petitioners to receive compensation. First, a petitioner may demonstrate a "Table" injury—i.e., an injury listed on the Vaccine Injury Table that occurred within the provided time period. 42 U.S.C. § 300aa-11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B). Second, where the alleged injury is not listed on the Vaccine

---

infancy and emphasizing early seizure control in young children); Elza Vasconcellos et al., *Mental Retardation in Pediatric Candidates for Epilepsy Surgery: The Role of Early Seizure Onset*, 42 Epilepsia 268 at 1 (2001), filed as "Resp. Ex. E, Tab 18" (finding that onset of intractable epilepsy before age two significantly increased the risk of intellectual disability, particularly with daily seizures); Anne T. Berg et al., *Longitudinal Assessment of Adaptive Behavior in Infants and Young Children with Newly Diagnosed Epilepsy: Influences of Etiology, Syndrome, and Seizure Control*, 114 Pediatrics 645 at 5 (2004), filed as "Resp Ex. E, Tab 19" (finding that childhood epilepsy outcomes vary widely and that epileptic encephalopathy syndromes are associated with particularly poor neurologic outcomes even after accounting for symptomatic etiology and poor seizure control).

Injury Table, a petitioner may demonstrate an "off-Table" injury, which requires that the petitioner "prove by a preponderance of the evidence that the vaccine at issue caused the injury." *Capizzano*, 440 F.3d at 1320; *see* § 11(c)(1)(C)(ii); *see also Wright v. Sec'y of Health & Human Servs.*, 22 F.4th 999, 1006 (Fed. Cir. 2022) (defining the term *residual effects* in the Act, as "detrimental conditions within the patient, such as lingering or recurring signs and symptoms" of the alleged vaccine injury, which are compensable). A petitioner need not show that the vaccination was the sole cause, or even the predominant cause, of the alleged injury; showing that the vaccination was a "substantial factor" and a "but for" cause of the injury is sufficient for recovery. *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006); *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Petitioners are not required "to eliminate alternative causes as part of establishing [their] prima facie case." *Doe v. Sec'y of Health & Human Servs.*, 601 F.3d 1349, 1357-58 (Fed. Cir. 2010); *see Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1152 (Fed. Cir. 2007) (holding that a "petitioner does not bear the burden of eliminating alternative independent potential causes"). Once a petitioner has proven causation by preponderant evidence, "the burden then shifts to the respondent to show by a preponderance of the evidence that the injury is due to factors unrelated to the administration of the vaccine." *Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367 (Fed. Cir. 2013) (citing 42 U.S.C. § 300aa-13(a)(1)(B)).[102]

To prove causation, a petitioner must satisfy the three-pronged test established in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005). *Althen* requires that a petitioner show by preponderant evidence that a vaccination they received caused their injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. Together, these prongs must show "that the vaccine was 'not only a but-for cause of the injury but also a substantial factor in bringing about the injury.'" *Stone v. Sec'y of Health & Human Servs.*, 676 F.3d 1373, 1379 (Fed. Cir. 2012) (quoting *Shyface*, 165 F.3d at 1352-53). Causation is determined on a case-by-case basis, with "no hard and fast per se scientific or medical rules." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge, the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano*, 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen*, 418 F.3d at 1280.

Each *Althen* prong requires a different showing. Under the *Althen* prong I, a petitioner must provide a "reputable medical theory" demonstrating that the vaccine received can cause the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citation omitted). To satisfy this prong, a petitioner's "theory of causation must be supported by a 'reputable medical or scientific

[102] The Vaccine Act also requires a petitioner to show by preponderant evidence that the vaccinee suffered from the "residual effects or complications" of the alleged vaccine-related injury for more than six months, died from the alleged vaccine-related injury, or required inpatient hospitalization and surgical intervention as a result of the alleged vaccine-related injury. § 11(c)(1)(D). It is undisputed that this requirement is satisfied in this case. *See* Rule 5 Order (ECF No. 39) at 4 (former Special Master citing to Dr. Kinsbourne's expert report, Pet. Ex. 15 at 4, and noting that "[V.S.'s] seizures were considered to be controlled at approximately the year two mark"); *see also* Resp. Posth'g Br. at 8.

explanation.'" *Andreu*, 569 F.3d at 1379 (quoting *Althen*, 418 F.3d at 1278). This theory need only be "legally probable, not medically or scientifically certain." *Id*. at 1380 (emphasis omitted) (quoting *Knudsen*, 35 F.3d at 548); *see also Boatmon v. Sec'y of Health & Human Servs*., 941 F.3d 1351, 1359 (Fed. Cir. 2019). Nevertheless, "petitioners [must] proffer trustworthy testimony from experts who can find support for their theories in medical literature." *LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334, 1341 (Fed. Cir. 2014).

*Althen* prong II requires proof of a "logical sequence of cause and effect." *Capizzano*, 440 F.3d at 1326 (quoting *Althen*, 418 F.3d at 1278). Even if the vaccination can cause the injury, a petitioner must show "that it did so in [this] particular case." *Hodges*, 9 F.3d at 962 n.4 (citation omitted). "A reputable medical or scientific explanation must support this logical sequence of cause and effect," *Id*. at 961 (citation omitted), and "treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury," *Paluck v. Sec'y of Health & Human Servs.*, 786 F.3d 1373, 1385 (Fed. Cir. 2015) (quoting *Andreu*, 569 F.3d at 1375).

*Althen* prong III requires that a petitioner establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *De Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id*. However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Human Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

A petitioner may also be eligible for compensation if the vaccinee had a preexisting condition which was significantly aggravated by a vaccine. *See* § 11(c)(1)(C). In considering a significant aggravation claim for an on-Table injury, the Federal Circuit placed the most significance on whether a petitioner's symptoms began within the time period proscribed. *Whitecotton v. Sec'y of Health & Human Servs*., 81 F.3d 1099, 1107 (Fed. Cir. 1996) ("Instead of asking whether the person's symptoms would have occurred absent the vaccine, our test hoves (sic) close to the statutory mandate, and relieves a petitioner of the burden of proving causation if she can show that the first symptom or manifestation of the significant aggravation of her condition occurred within the table time period provided in the statute.").

For a significant aggravation claim for an off-Table injury, the petitioner's burden is expanded to six elements, requiring a petitioner to show, by preponderant evidence, proof of "(1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition

to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation." *Loving v. Sec'y of Health & Human Servs*., 86 Fed. Cl. 135, 144 (2009). The fourth, fifth, and sixth elements are derived from *Althen* prongs I, II, and III, respectively. *Id*. The Federal Circuit has agreed with this approach. *See W.C. v. Sec'y of Health & Human Servs*., 704 F.3d 1352, 1357 (Fed. Cir. 2013) ("We hold that the *Loving* case provides the correct framework for evaluating off-table significant aggravation claims.")

However, the third *Loving* element, determining whether the vaccinee suffered a "significant aggravation" of her condition, leads to the question of what constitutes a significant aggravation. Based on the legislative history and the language of the statute, it appears that Congress intended for a "significant aggravation" of a condition to present rather dramatically. *See* H.R. Rep. 908, 99th Cong.2d Sess. 1, *reprinted in* 1986 USCCAN 6287, 6356 ("This [significant aggravation] provision does not include compensation for conditions which might legitimately be described as preexisting (e.g., a child with monthly seizures who, after vaccination, has seizures every three and a half weeks), *but is meant to encompass serious deterioration* (e.g., a child with monthly seizures who, after vaccination, has seizures on a daily basis" (emphasis added)); *see also* 42 U.S.C. § 300aa-33(4) ("The term "significant aggravation" means any change for the worse in a preexisting condition which results in *markedly greater* disability, pain, or illness accompanied by *substantial deterioration* of health" (emphasis added)).

Once a petitioner has established that the condition worsened post-vaccination, the special master must determine "whether the change for the worse in [the vaccinee's] clinical presentation was aggravation or a natural progression" of the preexisting condition. *Hennessey v. Sec'y of Health & Human Servs.*, No. 01-190V, 2009 WL 1709053, at *42 (Fed. Cl. Spec. Mstr. May 29, 2009), *decision aff'd*, 91 Fed. Cl. 126 (2010).

### B. Legal Standard Regarding Fact Finding

The process for making determinations in Vaccine Program cases regarding factual issues begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs*., 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs*., No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell v. Sec'y of Health & Human Servs*., 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co*., 333 U.S. 364, 396 (1948).

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining facts such as the onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs*., No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs*., No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"); *see also Burns v. Sec'y of Health & Human Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

There are situations in which compelling oral testimony may be more persuasive than written records. *See Campbell*, 69 Fed. Cl. at 779. When witness testimony contradicts medical records, such testimony must be consistent, clear, cogent, and compelling to be persuasive. *See Sanchez v. Sec'y of Health & Human Servs*., No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (vacated on other grounds, *Sanchez v. Sec'y of Health & Human Servs*., No. 2019-1753, 2020 WL 1685554 (Fed. Cir. Apr. 7, 2020), *review denied, Sanchez v. Sec'y of Health & Hum. Servs*., 152 Fed. Cl. 782 (2021)) (quoting *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *e.g., Stevenson v. Sec'y of Health & Human Servs*., No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Special masters may also consider other types of evidence, such as unsworn statements, on the grounds that the Vaccine Program was designed to have "flexible and informal standards of admissibility of evidence." 42 U.S.C. § 300aa-12(d)(2)(B); *see also Munn v. Sec'y of Health & Human Servs*., 970 F.2d 863, 873 (Fed. Cir. 1992). In short, "the record as a whole" must be considered. § 13(a).

Establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of her claim. *Lampe*, 219 F.3d at 1361. The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires that courts determine the reliability of an expert opinion before it may be considered as evidence. "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590 (citation omitted). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324.

The *Daubert* factors are used in *weighing* the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Human Servs.*, 94 Fed. Cl. 53, 66-67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). And

nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Finally, although this decision discusses only some evidence in detail, I have reviewed and considered all of the medical records and literature submitted in this matter. *See Moriarty v. Sec'y of Health & Human Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); *Simanski v. Sec'y of Health & Human Servs.*, 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'") (citation omitted), *aff'd*, 601 F. App'x 982 (Fed. Cir. 2015).

## VI. <u>Discussion</u>

Petitioner does not allege an injury listed on the Vaccine Injury Table. Therefore, her claim is classified as "off-Table," and she bears the burden of establishing by preponderant evidence that the vaccinations at issue caused V.S's alleged injury. *See Capizzano*, 440 F.3d at 1320. If petitioner satisfies that burden, respondent may demonstrate, by preponderant evidence, that the injury was caused by a factor unrelated to the vaccinations. *See Deribeaux*, 717 F.3d at 1367; § 13(a)(1)(B). The Vaccine Act excludes from *factors unrelated*, however, any "idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition." § 13(a)(2)(A).

The experts agree that V.S. was microcephalic at birth and suffered abnormal brain development with destruction of brain tissue while in utero. Pet. Preh'g Br. at 10; Tr. at 16, 39, 102, 106. Dr. Kinsbourne acknowledged that V.S. was born with microcephaly and a prominent occiput with overlapping skull bones, evidencing partial prenatal destruction of brain tissue potentially due to the disruption of fetal blood supply. Pet. Ex. 15 at 5; Tr. at 24. He referred to her condition as a "prenatal structural mishap" with possible hypoxic-ischemic injury. *Id.* at 84. He argued however that this was a static condition that did not affect her functioning in the first four months of life and that her vaccinations independently contributed to the onset of seizures and developmental impairment. *Id.* at 24, 28-29, & 84; Pet. Ex. 15 at 5-9. Dr. Holmes disagreed, asserting that the location of the white matter abnormalities seen on imaging was supportive of chronic prenatal hypoxic injury which caused her seizures and development delay. Tr. at 106; *see also* Pet. Ex. 15 at 5 (Dr. Kinsbourne citing literature[103] as support for his opinion that the shape of V.S.'s skull suggested that she had suffered "partial brain destruction due to prenatal partial disruption of the blood supply to the brain").

Thus, neither party attributes V.S.'s microcephaly or underlying structural brain abnormalities to her vaccinations. Therefore, the dispute is whether the October 3, 2016

[103] Russell et al., *supra* note 51.

vaccinations V.S. received either caused her seizure disorder/epilepsy and developmental impairment or significantly aggravated her preexisting condition.

To establish causation under *Althen*, petitioner must demonstrate 1) a medical theory causally connecting the subject vaccinations to the alleged injury; 2) a logical sequence of cause and effect between V.S.'s October 3, 2016 vaccinations and her condition; and 3) a medically appropriate temporal relationship between the vaccinations and the onset of V.S.'s symptoms. *See Althen*, 418 F.3d at 1278.

For her significant-aggravation claim, petitioner must establish under *Loving*: 1) V.S.'s condition before vaccination; 2) her condition after vaccination; 3) whether the change constituted a significant aggravation; 4) a medical theory causally connecting the vaccinations to that worsening; 5) a logical sequence of cause and effect showing that the vaccinations caused the worsening; and 6) a medically acceptable temporal relationship between the vaccinations and the worsening. *See Loving*, 86 Fed. Cl. at 144.

Because the final three *Loving* requirements substantially parallel the three *Althen* prongs, the undersigned considers each corresponding pair together: *Althen* prong I with *Loving* prong 4, *Althen* prong II with *Loving* prong 5, and *Althen* prong III with *Loving* prong 6. Special masters may focus on the last three elements in *Loving*, which correspond to the framework for causation-in-fact cases. *Hennessey v. Sec'y of Health & Human Servs.*, No. 01-190V, 2009 WL 1709053, at *42 (Fed. Cl. Spec. Mstr. May 29, 2009), *mot. for rev. denied*, 91 Fed. Cl. 126 (2010). The remaining *Loving* requirements are then addressed separately.

For the reasons explained below, petitioner has not established that the vaccinations V.S. received caused a new injury or significantly aggravated her preexisting condition. Petitioner is therefore not entitled to compensation.

### A. *Althen* Prong I/*Loving* Prong 4

Under *Althen* prong I, petitioner must present a sound and reliable medical theory causally connecting the subject vaccinations to the alleged injury. In the significant-aggravation context, *Loving* prong 4 similarly requires a medical theory explaining how the vaccination could aggravate the preexisting condition in the manner alleged.

Dr. Kinsbourne agreed that V.S. had microcephaly, structural brain abnormalities, and had suffered from hypoxia prior to her receipt of the subject vaccinations. But these conditions only made V.S. susceptible to seizures likening her susceptibility to the genetically lowered seizure threshold observed in children with Dravet syndrome. Pet. Ex. 15 at 6-7. Dr. Kinsbourne further theorized that the October 3, 2016 vaccinations activated V.S.'s innate immune system, generating cytokines sufficient enough to trigger an abrupt onset of myoclonic epilepsy without fever. *See* Tr. at 74; Pet. Posth'g. Br. at 8; Pet. Reply at 9-10.

In general, the literature filed by both parties supports that vaccinations can cause fever, which can precipitate febrile seizures, with only a few case reports discussing afebrile seizures

occurring within temporal proximity to vaccination without association of causation.[104] The literature also supports that children with underlying neurologic abnormalities may be more susceptible to seizures[105] and that early, difficult-to-control epilepsy can adversely affect neurodevelopment.[106] However, these general propositions do not establish the critical step necessary to support Dr. Kinsbourne's theory that routine childhood vaccinations can provoke a cytokine-mediated mechanism sufficient enough to cause the onset of myoclonic epilepsy without fever while disregarding the existence of a preexisting severe microcephaly with structural brain abnormalities. *See* Tr. at 78; *see also* Pet. Reply at 4, 6.

Dr. Kinsbourne relied on literature which discussed circumstances materially different from this case. Several of his references focus on Dravet syndrome and describe children with genetic abnormalities that affect their sodium channels and predispose them to epilepsy.[107] In that setting, any stressor (e.g. vaccination, fever, or infection) may precipitate seizure activity. The literature supports the proposition that vaccination may act as a trigger in a child with a specific genetic epileptic disorder;[108] however, V.S. did not have an identified genetic abnormality, and Dr. Kinsbourne did not identify a malfunctioning protein or analogous molecular abnormality through which vaccination could produce the same effect. Even accepting Dr. Kinsbourne's analogy to Dravet syndrome, evidence that vaccination may precipitate seizure onset in children with that disorder does not establish that vaccination alters its underlying clinical course or prognosis.[109] *See* Oliver v. Sec'y of Health & Human Servs., No. 10-394V,

---

[104] Verbeek et al., *supra* note 9, at 6-7 (finding that genetic or structural defects explained epilepsy onset after vaccination in a majority of the study's cohort; that a genetic basis for the onset was not ruled out for the remainder of the cohort, as their genetic analyses were incomplete; and that the cohort's heterogeneous epilepsy syndromes and variability in cognitive outcomes favored diverse underlying predispositions, rather than vaccination as a common cause of neurologic deterioration).

[105] Cendes & Sankar, *supra* note 9; Scheffer, *Vaccination Triggers, Rather Than Causes, Seizures*, *supra* note 63; McIntosh et al., *supra* note 64.

[106] Kleen et al., *supra* note 101; Berg et al., *Age at Onset of Epilepsy, Pharmacoresistance, and Cognitive Outcomes: A Prospective Cohort Study*, *supra* note 101; Vasconcellos et al., *supra* note 101; Berg et al., *Longitudinal Assessment of Adaptive Behavior in Infants and Young Children with Newly Diagnosed Epilepsy: Influences of Etiology, Syndrome, and Seizure Control*, *supra* note 101.

[107] Cendes & Sankar, *supra* note 9; Scheffer, *Vaccination Triggers, Rather Than Causes, Seizures*, *supra* note 63; McIntosh et al., *supra* note 64.

[108] *See* Cendes & Sankar, *supra* note 9, at 2 ("[A]ny febrile illness could have produced the first seizure in the genetically susceptible individuals, and the febrile response to immunization, although commonly encountered, would *not* have produced an epileptic encephalopathy in an individual *without* a mutation conferring genetic susceptibility.") (emphasis added).

[109] Cendes & Sankar, *supra* note 9, at 2 (analyzing a cohort of patients with Dravet syndrome and finding "no differences" in "seizure types, developmental regression, [and] degree of intellectual disability" among the patients who reported seizure onset prior to vaccination, patients reporting seizure onset within 2 days post-vaccination, and those reporting vaccine-distant seizure onset); McIntosh et al., *supra* note 64, at 1 ("Vaccination might trigger earlier onset of Dravet syndrome in children, who… are destined to develop the disease. However,… [the authors] found no evidence that vaccinations before or after disease onset affect outcome.".

2017 WL 747846, at *16 (Fed. Cl. Spec. Mstr. Feb. 1, 2017), review denied, decision aff'd, 133 Fed. Cl. 341 (2017), aff'd, 900 F.3d 1357 (Fed. Cir. 2018).

Dr. Kinsbourne relied on other literature that also did not fill the gap. Several of the cited studies discuss seizures after vaccination not the onset of epilepsy.[110] Seizures and epilepsy are not the same.[111] Structural epilepsy, which V.S. has, is an enduring neurologic disorder involving a predisposition to recurrent seizures attributable to structural abnormalities of the brain. Tr. at 138 (Dr. Holmes explaining, by analogy to recurrent cardiac arrhythmias, that just as successive arrhythmias reflect an underlying problem with the heart, recurrent seizures reflect an underlying problem with the brain, rather than one episode causing another). Thus, identifying an event that precipitated a particular seizure does not, without more, establish that the event caused the underlying epileptic disorder.[112] Tr. at 138 (Dr. Holmes explaining that epilepsy is characterized by an underlying propensity for recurrent seizures, which need not be causally related to one another). This distinction is significant. Although vaccination may cause fever and, in turn, precipitate a febrile seizure, the evidence does not establish that vaccination causes epilepsy or that a vaccine-associated febrile seizure increases the likelihood of subsequently developing epilepsy. *See also*, *Gram v. Health & Human Servs*., No. 15-515V, 2022 WL 17687972, at *47 (Fed. Cl. Spec. Mstr. Nov. 16, 2022) (crediting respondent's experts' explanation that "there is no convincing evidence that vaccines can cause seizures in the absence of a fever or that vaccines can cause epilepsy.").

Indeed, literature[113] examining epilepsy beginning after vaccination often identified genetic or structural abnormalities as the underlying cause, with the heterogeneity of epilepsy syndromes and outcomes favoring patient-specific predispositions, rather than vaccination as a common cause of neurologic deterioration.

In developing a mechanistic theory, Dr. Kinsbourne relied principally on surveillance reports[114] capable of describing temporal patterns but not of establishing causation, and a commentary on an experiment,[115] which simulated infection and hyperthermia but not vaccination. Dr. Kinsbourne stated that activation of the innate immune system can occur within hours of vaccination and that the resulting increase in cytokines may affect neuronal excitability. Tr. at 81-82 (stating that "the cytokines that [are] aroused by the innate immune system" are sufficient to cause seizures in a "predisposed" child and that "these seizures might happen very rapidly"); *see also* Pet. Ex. 15 at 7 (noting that the innate immune response can initiate within

---

[110] *E.g.*, Le Saux et al., *supra* note 57; Mazarati, *supra* note 65.

[111] *See supra* Section III.

[112] *E.g.*, Jensen & Baram, *supra* note 54, at 6 (finding that prolonged febrile seizures in an immature rodent brain "do not cause spontaneous seizures, i.e., epilepsy"); Sun et al., *supra* note 56, at 1 (finding an association between DTaP and febrile seizures, but no increased risk of epilepsy following DTaP-IPV-Hib vaccination).

[113] *E.g.*, Verbeek et al., *supra* note 9 at 6-7; *see also* Sutula, *supra* note 72.

[114] *E.g.*, Le Saux et al., *supra* note 57; Wise et al., *supra* note 58; von Spiczak et al., *supra* note 60.

[115] Mazarati, *supra* note 65.

hours of an immune challenge). In turn, Dr. Holmes noted that the literature and medical records Dr. Kinsbourne relied on to support his theory did not demonstrate that routine peripheral immunization produces the magnitude or pattern of cytokine activity necessary to cause multifocal myoclonic seizures. Tr. at 125-27

A similar deficiency exists in Dr. Kinsbourne's theory that seizures beget seizures. *Id*. at 81-82; *see also* Pet. Ex. 15 at 7, 8. Dr. Kinsbourne stated that Dr. Holmes's scholarship serves as support for this proposition. Tr. at 82. Dr. Holmes subsequently rejected its relevancy to V.S.'s course, explaining that her first seizure did not initiate a cascade causing the second and third, but rather that the underlying epileptic disorder declared itself with an unprovoked, afebrile seizure. *Id*. at 136-139. Subsequent seizures reflected the continuing propensity of an epileptic brain and did not require a new external trigger. *Id*.

Ultimately, Dr. Kinsbourne supported several general principles: vaccination activates the innate immune system, producing cytokines; for some children, vaccination may be followed by fever and febrile seizures; for children with Dravet syndrome, vaccination may be followed by afebrile seizures as a stress response; and recurrent, prolonged early-life seizures may worsen developmental outcome. However, a persuasive bridge is missing connecting the subject vaccinations with any of the following: onset of epilepsy in general; onset of epilepsy in the context of severe microcephaly and structural brain damage; a stress response inducing afebrile seizures similar to that observed in Dravet syndrome in the context of severe microcephaly and prenatal, structural brain damage; or a vaccine-induced cytokine response inducing multifocal myoclonic epilepsy in the absence of fever or other evidence of an inflammatory brain process.[116]

For those reasons, petitioner has not established by preponderant evidence a sound and reliable medical theory causally connecting the subject vaccinations to the onset or significant aggravation of afebrile seizures, myoclonic epilepsy, epilepsy in general, or developmental delay. *Althen* prong I and *Loving* prong 4 are therefore not satisfied.

### B. *Althen* Prong II/*Loving* Prong 5

To establish *Althen* prong II and *Loving* prong 5, petitioner must demonstrate a logical sequence of cause and effect between V.S.'s October 3, 2016 vaccinations and her myoclonic seizure disorder/epilepsy and developmental delay and/or the worsening of that condition. *See Althen*, 418 F.3d at 1278; *Loving*, 86 Fed. Cl. at 144. Having been unsuccessful in sustaining her burden for *Althen* prong I/*Loving* prong 4, it follows that petitioner cannot sustain her burden under *Althen* prong II/ *Loving* prong 5. However, the remaining *Athen/Loving* prongs will be addressed in full.

[116] The evidence of V.S.'s severe microcephaly and associated structural brain abnormalities cannot be divorced from the assessment of petitioner's proposed causal mechanisms. *See Stone v. Sec'y of Health & Human Servs.*, 676 F.3d 1373, 1380 (Fed. Cir. 2012) (observing that "in some cases a sensible assessment of causation cannot be made while ignoring the elephant in the room—the presence of compelling evidence of a different cause for the injury in question.").

The medical records, clinical presentation, and MRI results clearly establish that V.S. was microcephalic at birth with a head circumference at the 4th percentile. Pet. Ex. 12 at 1; Tr. at 21-22 (Dr. Kinsbourne stating that "[i]f you're below the 5th percentile, then you can be legitimately called microcephalic."). By two months of age, her head circumference was below the 1st percentile. Pet. Ex. 12 at 10, 12. The MRI results confirmed structural brain abnormalities, including thinning of the posterior corpus callosum, decreased volume in the basal ganglia and thalami, prominent lateral and third ventricles with extra axial spaces indicative of prior ischemic injury and less likely neurodegenerative process. Pet. Ex. 2 at 91-92, 134, 299-300, 310. White-matter and corpus-callosum abnormalities are commonly associated with microcephaly.[117]

Dr. Kinsbourne argued that V.S.'s prenatal brain injury may have given rise to seizure susceptibility but did not make epilepsy inevitable, noting that V.S. was seizure-free the first four months of life. Pet. Ex. 15 at 6, 8. A finding of microcephaly describes an abnormally small head size associated with impaired brain growth, but does not, standing alone, identify the precise cause or extent of the underlying neurologic condition. Pet. Reply at 2 ("Petitioner's argument is that [V.S.]'s microcephaly predisposed her to epilepsy but did not destine her to develop epilepsy"); *see also* Tr. at 102-103 (Dr. Holmes stated that microcephaly is "a heterogeneous condition," and that some of the children with microcephaly "do pretty well, but those are very few and far between."). Dr. Holmes, however, stated that children with microcephaly commonly develop epilepsy during the first year of life and may experience seizure onset at any time from infancy to adulthood.[118] Thus, V.S.'s remaining seizure-free for approximately four months did not, in his view, make the later emergence of epilepsy unexpected.

Microcephaly is not merely an isolated difference in head circumference without potential neurologic consequences. *See* Tr. at 84 (Dr. Kinsbourne testified that it was "perfectly clear" that V.S's epilepsy was structural in nature rather than genetic). The literature demonstrates that children with microcephaly have increased rates of developmental disability, abnormal neuroimaging, and epilepsy. *Ashwal et al.*,[119] an evidence-based review, found correlations between the degree of microcephaly and the severity of cerebral atrophy, ventricular dilation, and cognitive impairment. *Aggarwal et al.*[120] reported significantly increased risks of developmental delay and epilepsy among children with microcephaly. Thus, while microcephaly does not make epilepsy inevitable, severe microcephaly increases the risk for neurologic consequences, and V.S. was severely microcephalic.

In addition to her microcephaly, V.S.'s brain imaging revealed structural abnormalities, a consequence of an in-utero ischemic/hypoxic event. While the October 2016 MRI was initially interpreted as normal, review of that study alongside the subsequent September 2017 MRI

---

[117] von der Hagen et al., *supra* note 78, at 4.

[118] Abdel-Salam et al., *supra* note 80 at 3; Barkovich et al., *supra* note 80 at 11.

[119] Ashwal et al., *supra* note 13, at 2, 4-5.

[120] Aggarwal et al., *supra* note 52, at 5 ("Our results are evidence for association of cerebral palsy and mental retardation with microcephaly… [and] [r]isk of comorbidities like vision, hearing, developmental delay, and epilepsy increases significantly with presence of microcephaly.").

revealed both thinning of the posterior corpus callosum and decreased volume of the basal ganglia and thalami. Pet. Ex. 8 at 48-55; Pet. Ex. 2 at 91-96. Dr. Kinsbourne agreed that the second MRI evidenced "a good amount of abnormality" that may not have been appreciated during the earlier MRI, because "as any baby gets older…lack of myelination becomes more evident." Tr. 31-32; Pet. Ex. 15 at 3.[121] A third MRI, obtained in January 2019, showed white-matter volume loss with no new areas of signal abnormality or diffusion restriction and was considered the likely sequela of prior insult that was potentially ischemic in nature. Pet. Ex. 2 at 299-300.

The October 8, 2016 imaging and treating physicians' reports provide contemporaneous evidence of structural brain abnormalities, including tissue volume loss, already present five days after the subject vaccinations. Later imaging reflected the chronicity of the prenatal injury, rather than a new or ongoing neurodegenerative process. Pet. Ex 2 at 91-96, 134, 299-300, 310. Dr. Vawter-Lee concluded that the MRI abnormalities explained a prenatal insult even though no ischemic event was documented at the time of delivery, with a neurodegenerative process determined to be less likely. *Id.* at 310. She noted that she could not retrospectively determine whether the MRI abnormalities predated seizure onset, were secondary to seizures, or were the result of seizures triggered by vaccinations in a predisposed brain. *Id.* However, Dr. Kinsbourne opined that the imaging results "revealed extensive structural abnormalities… most likely due to a prenatal hypoxic-ischemic encephalopathy, well before the time of her delivery." Pet. Ex. 15 at 5. Dr. Kinsbourne's interpretation is also consistent with literature identifying white-matter and corpus-callosum abnormalities among the imaging findings commonly associated with microcephaly.[122]

Despite the foregoing, petitioner maintained that, apart from a small head circumference, occiput malformation, slight dysmorphic features, and unmanifested predisposition to epilepsy, V.S. was developing normally in the first four months of life before the administration of the subject vaccinations. *See* Pet. Reply at 3-4 (petitioner argues that "[V.S.] was developing normally prior to her vaccinations at four months"); Pet. Ex. 12 at 3; Pet. Ex. 8 at 44-46. Petitioner characterized the developmental limitations observed beyond the first four months of life as a marked regression caused by the seizure disorder allegedly triggered by the vaccinations at issue. Pet. Reply at 3-4. Petitioner's argument is belied by the experts' opinions regarding the cause and extent of V.S.'s brain abnormalities and severe microcephaly, which preexisted her vaccinations. Tr. at 39, 84, 106; *see also* Resp. Ex. A at 3 (Dr. Shinnar opined that V.S.'s developmental delay did not immediately manifest, which he characterized as "typical in this clinical context.").

A distinction exists between delayed development and regression. Regression signifies loss of a skill or developmental level that the child had previously attained; a child cannot regress from a milestone she had not yet achieved. *Martin v. Sec'y of Health & Human Servs.*, No. 13-

---

[121] *Myelination* or *myelinization* refers to the formation of the *myelin sheath*, or the membrane that serves as an electrical insulator to speed the conduction of nerve impulses, and *demyelination* refers to the loss of the myelin sheath. *Dorland's* at 1201, 1673.

[122] von der Hagen et al., *supra* note 78, at 4.

486V, 2020 WL 6865931, at *7-8 (Fed. Cl. Spec. Mstr. Oct. 27, 2020). A child with impaired prenatal brain development may acquire skills slowly, with the extent of impairment becoming increasingly more apparent when age-appropriate expectations are not met.[123] *See* Resp. Ex. A at 2, 3 (Dr. Shinnar pointed to V.S.'s medical records, noting that her "[d]evelopmental delay persisted though she did make slow progress and never had regression of her milestones.").

Importantly, V.S.'s neurological examination and assessment when presented four days post-vaccination with abnormal jerking movements of her extremities revealed an alert, awake, playful, consolable four-month-old unbothered by the episodes with no postictal state. Pet. Ex. 8 at 1-7, 14, 44-46; Pet. Ex. 13 at 1-2. Physical examination revealed mild generalized hypotonia but was otherwise unremarkable. *Id*. at 45. Prominent medical epicanthal folds, left esotropia, and slight facial dysmorphism were noted. *Id*. at 45. A concern for developmental delay was documented at that time, as V.S. did not smile during any interactions observed in the hospital room and had reportedly only once rolled from prone to supine position. *Id*. The attending child neurologist characterized V.S. as a four-month-old with new onset myoclonic seizures in the context of *developmental delay*, *microcephaly, and failure to thrive*. Pet. Ex. 8 at 35 (emphasis added). The broad differential diagnosis included metabolic, mitochondrial, genetic, and structural brain abnormalities as potential etiologies for V.S.'s seizure-like activity with no reference to her vaccinations as a cause. *Id*.

Succinctly, V.S. was already considered developmentally delayed when presented on October 8, 2016, at four months of age in the context of severe microcephaly, structural brain abnormalities, and failure to thrive with mild hypotonia and only having rolled over once. Her medical records thereafter show that her development continued slowly without observed regressions. *E.g.* Pet. Ex. 2 at 2, 138.

Next, children with microcephaly face an increased risk of epilepsy. Tr. at 46-25 (Dr. Kinsbourne estimated that approximately 40 to 42 percent of individuals with microcephaly eventually develop epilepsy, compared with approximately 3 to 4 percent of the general population) & 103-134 (Dr. Holmes estimated that 40 to 50 percent of people with microcephaly suffer seizures and acknowledged that many children with microcephaly never become epileptic). Dr. Holmes cautioned against conflating the elevated lifetime risk of epilepsy with a generally heightened seizure susceptibility or reduced seizure threshold, as suggested by Dr. Kinsbourne. *Id*. at 134. Dr. Holmes stated that V.S. was at increased risk for epilepsy due to the severity of her microcephaly; however, this did not mean she had lower susceptibility to seizures in response to any particular external stressor, which was evidenced by the fact that V.S. did not develop seizures as a result of her two-month-old vaccinations or her upper respiratory infection that imposed a greater antigenic load than vaccinations. *Id*. at 134; Pet. Ex. 12 at 12-14.

That distinction bears directly on petitioner's theory that the October 2016 vaccinations provided the trigger that converted an underlying predisposition for epilepsy into active epilepsy. Microcephaly, however, carries significant risk for epilepsy, and no external trigger is required

[123] *See* Aggarwal et al., *supra* note 52, at 5; Ashwal et al., *supra* note 13, at 5 ("[T]here is a correlation between the degree of microcephaly and the severity of cognitive impairment").

for epilepsy to manifest in patients with microcephaly.[124] Dr. Kinsbourne conceded that he had found no literature indicating that patients with microcephaly develop epilepsy following a trigger independent of the underlying condition and that his assertion regarding the need for a trigger was only a "general" statement. Tr. at 47.

Dr. Kinsbourne agreed that V.S. suffered from structural epilepsy caused by prenatal structural brain abnormalities. Tr. 84. He agreed that her first recognized seizure was afebrile. He expressly testified that vaccines do not cause epilepsy. Tr. at 49, 67 ("[V]accines don't cause epilepsy [rather they] induce seizure activity, and whether that goes into epilepsy or not is not determined by the vaccine [but] by the host… by the individual's individual susceptibilities."). Nonetheless, he maintained that V.S.'s vaccinations precipitated the first clinical manifestation of her epilepsy and that the ensuing seizures altered her developmental and neurological course, making future seizures more likely and contributing to her later impairment. Pet. Reply at 7 ("Once the first seizure was triggered, it started a process that led to more seizures."); Tr. at 57-58 ("the cumulative effect of these ongoing, particularly severe seizures…must have had a major effect in slowing down the child's cognitive development") (repeated word omitted).

Epilepsy does not require a triggering event but rather may spontaneously manifest in the context of microcephaly and structural brain abnormalities. The record does not demonstrate the inflammatory process proposed by Dr. Kinsbourne; V.S. was afebrile at the time of seizure-onset, and Dr. Holmes identified no findings on examination, MRI, EEG, or through laboratory testing that he considered indicative of a substantial cytokine-mediated brain inflammation. Tr. at 130-31, 132-33. Rather, V.S. began experiencing recurrent, unprovoked afebrile seizures, and Dr. Holmes considered those seizures manifestations of the underlying epileptic disorder itself, not the product of a continuous, vaccine-induced cascade.

The medical literature provides that frequent, prolonged, or uncontrolled seizures during infancy may, under some circumstances, interfere with developmental processes or influence later seizure susceptibility.[125] However, the literature[126] also supports that epilepsy and cognitive impairment may arise independently from the same primary brain disorder, rather than the seizures themselves causing the impairment. Dr. Holmes more persuasively explained that, in children with severe microcephaly, the underlying structural brain abnormalities are more likely

---

[124] Aggarwal et al., *supra* note 52, at 5. Ashwal et al., *supra* note 13, at 4.

[125] *E.g.*, Ben-Ari & Holmes, *supra* note 71, at 6 (noting that seizures do not uniformly cause further seizures or developmental harm); Berg et al., *Age at Onset of Epilepsy, Pharmacoresistance, and Cognitive Outcomes: A Prospective Cohort Study*, *supra* note 101, at 1 ("Uncontrolled seizures impair cognitive function with effects being most severe in infancy and lessening with increasing age at onset."); Vasconcellos et al., *supra* note 101, at 1 ("[O]nset of intractable epilepsy within the first 24 months of life is a significant risk factor for [developmental delay], especially if seizures occur daily.").

[126] *E.g.*, Abdel-Salam et al., *supra* note 80, at 7 ("…it is unlikely that the lower IQ observed with the increased severity of epilepsy [is] due to damaging effect of the seizures. The fact that the mean IQ of participants whose seizures were controlled by antiepileptic drug therapy was much the same as those who were not controlled suggests that both the epilepsy and the lower IQ were the result of the primary brain disorder.").

than not the principal determinants of cognitive outcomes.[127] Taken together, the evidence preponderantly supports that V.S.'s severe microcephaly and associated structural brain abnormalities, rather than the subject vaccinations, account for her neurologic condition. This conclusion does not impose upon petitioner a burden to disprove an alternative cause; rather it reflects the weight of the evidence concerning the etiology of V.S.'s neurologic condition and the insufficiency of petitioner's affirmative showing of vaccine causation. *See Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 962 (Fed. Cir. 2023) (distinguishing a petitioner's failure to establish a prima facie case of vaccine causation from an impermissible requirement to affirmatively disprove an alternative cause).

Moreover, the record demonstrated that the prenatal hypoxic/ischemic event, resulting in structural brain damage and severe microcephaly, which was apparent at birth, became more prominent immediately thereafter with poor weight gain and head circumference measurements falling at or below the 1st percentile by two months of age. Tr. at 23-24; Pet. Ex. 8 at 35; Pet. Ex. 12 at 10. The opinions of the experts along with the literature[128] filed by both parties confirm that microcephaly and an underlying structural brain abnormality increases the risk of epilepsy and development delay. Tr. at 46-25 & 103-134. V.S. reportedly began suffering from afebrile seizures within hours of her four-month-old vaccinations. She was deemed already developmentally delayed upon neurological assessment at that time by virtue of her preexisting brain abnormalities and microcephaly.

Accordingly, the record does not preponderantly demonstrate that the vaccinations at issue, rather than the natural emergence of epilepsy associated with V.S.'s congenital brain abnormalities, caused the change in her condition. Petitioner therefore has not satisfied *Althen* prong II or *Loving* prong 5.

### C. *Althen* Prong III/*Loving* Prong 6

Petitioner alleges that V.S.'s first abnormal body movements occurred within hours of vaccination. Dr. Kinsbourne opined that this interval was medically appropriate because activation of the innate immune response may begin within hours of an immunologic challenge and because literature[129] described the greatest risk of post-DTaP seizure events occurring within the first several days post-vaccination, though that literature largely concerns febrile seizures.

Respondent's experts did not dispute the several-hour interval as temporally compatible with the onset of febrile seizures. Dr. Holmes argued that the close temporal relationship between the subject vaccinations and the reported onset of afebrile seizures was coincidental,

[127] *See also* Kleen et al., *supra* note 101; Berg et al., *Age at Onset of Epilepsy, Pharmacoresistance, and Cognitive Outcomes: A Prospective Cohort Study*, *supra* note 101; Vasconcellos et al., *supra* note 101; Berg et al., *Longitudinal Assessment of Adaptive Behavior in Infants and Young Children with Newly Diagnosed Epilepsy: Influences of Etiology, Syndrome, and Seizure Control*, *supra* note 101.

[128] Aggarwal et al., *supra* note 52, at 5. Ashwal et al., *supra* note 13, at 4.

[129] Sun et at., *supra* note 56 at 1, 9; Matin et al., *supra* note 56 at 6; *see also* Le Saux et al., *supra* note 57.

emphasizing that V.S. was at substantial risk of developing epilepsy as a consequence of her congenital brain abnormalities and severe microcephaly. That opinion bears principally on whether vaccination actually caused V.S.'s epilepsy, as considered under *Althen* prong II, *infra* Section VI.B, rather than whether the interval itself was medically acceptable.

Accordingly, while V.S.'s seizures began within several hours of vaccination, neither the medical literature nor the expert testimony persuasively establishes that the subject vaccinations could induce afebrile seizures through the proposed mechanisms within that interval. Thus, the temporal proximity of V.S.'s seizure onset to vaccination, without a medically supported basis for the proposed timeframe, is insufficient to satisfy *Althen* prong III or *Loving* prong 6.

### D. *Loving* Prongs 1, 2, & 3

Under *Loving* prong 1, petitioner must establish the vaccinee's condition before administration of the vaccines at issue. The record does not support the proposition that V.S. was neurologically and developmentally normal before the vaccinations. Rather, the record supports a prenatal injury, reflected by severe microcephaly, poor weight gain despite preserved length, and developmental delay upon assessment at four months of age, only four days after the subject vaccinations. The fact that her developmental delay became more apparent as she aged does not establish an alleged regression in her development; it simply reflects the limited ability to assess developmental divergence in early infancy. V.S.'s post-vaccination records include slow developmental milestones with no regression noted. *E.g.* Pet. Ex. 2 at 138; Pet. Ex. 3 at 16.

The experts agree that V.S. had congenital microcephaly resulting from a prenatal brain injury. Her small head circumference was glaringly apparent at her examinations prior to her four-month vaccinations. Later neuroimaging was interpreted as showing chronic structural abnormalities consistent with an antenatal process. V.S. had no known seizures or abnormal movement of her extremities reported prior to October 3, 2016 with progressive developmental impairment documented as she aged. V.S.'s pre-vaccination condition was clearly established.

*Loving* prong 2 requires consideration of V.S.'s condition after vaccination. Within hours of receiving the four-month-old vaccinations, V.S. purportedly experienced abnormal movement of her extremities or myoclonic seizures from which she did not seem to be bothered and did not experience a post ictal state. She was treated with antiseizure medications with the need for ongoing neurological care. As she grew older, substantial delays in motor, cognitive, and other developmental domains became evident. V.S.'s condition was different as she aged post-vaccination.

The comparison required under *Loving* prong 3 likewise demonstrates a substantial worsening in V.S.'s neurologic condition. Before vaccination, she had congenital microcephaly and underlying structural brain abnormalities, but no reported history of seizures. Thereafter, she developed structural myoclonic epilepsy with developmental impairment. The parties disagree sharply about the explanation for that progression: petitioner attributes it, at least in substantial part, to vaccine-triggered epilepsy, whereas respondent maintains that both the epilepsy and developmental delay were manifestations of the same prenatal brain disorder that caused V.S.'s microcephaly and structural brain abnormalities. That causation dispute does not eliminate the

objective difference between V.S.'s pre- and post-vaccination conditions but was addressed under *Loving* prongs 4 and 5.

## VII. Conclusion

I recognize the profound challenges V.S. and her family face as a result of her serious neurologic condition, as well as her family's dedication to advocating on her behalf. I am sympathetic to these circumstances, yet my decision must be guided by the evidence presented and governing legal standards.

Because petitioner has not established entitlement to compensation under the Vaccine Act, the petition must be dismissed. Several overlapping considerations support that conclusion. Most fundamentally, respondent's experts persuasively attributed V.S.'s epilepsy and developmental impairment to prenatal brain abnormalities, rather than to the October 3, 2016 vaccinations. That explanation is consistent with V.S.'s structural abnormalities including microcephaly, the known association between microcephaly and later development of epilepsy, and the absence of objective evidence supporting a cytokine-mediated inflammatory process, as proposed by Dr. Kinsbourne.

Dr. Kinsbourne did not persuasively establish a reliable mechanism by which the subject vaccinations could trigger afebrile myoclonic epilepsy in a child with V.S.'s condition, or a logical sequence of cause and effect showing that it did so here. Much of the literature on which he relied involved febrile seizures, temporal associations, or children with identified genetic-based epilepsies, such as Dravet syndrome, none of which adequately bridged the gap between the subject vaccinations and V.S.'s condition. Although V.S.'s seizures began within several hours of vaccination, the record does not establish a medically supported temporal relationship to distinguish vaccine causation from the coincidental onset of epilepsy associated with her congenital neurologic condition.

Petitioner has not established that the subject vaccinations either caused V.S.'s seizure disorder and developmental delay or significantly aggravated her preexisting condition. Accordingly, petitioner has failed to establish entitlement to compensation under the Vaccine Act. Compensation is therefore denied.

**IT IS SO ORDERED.**

/s/ Mindy Michaels Roth
Mindy Michaels Roth
Special Master